FRANK IMPARATO, Plaintiff-Appellee, *v.* MICHAEL WILLIAM ROONEY, Defendant-Appellant.

First District (5th Division)    No. 79-1835

Opinion filed April 3, 1981.

Stern, Rotheiser & Dupree, and Lord, Bissell & Brook, both of Chicago (James M. Dupree, Hugh C. Griffin, and Harold E. Jordan, of counsel), for appellant.

Harry S. Posner, of Chicago, for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial in which the trial court directed a verdict as to liability, plaintiff was awarded damages of $105,000. Defendant appeals, contending that: (1) he was denied a fair trial when plaintiff's counsel was allowed to interject defendant's insurer throughout the voir dire examination; and (2) the trial court erred in directing a verdict for plaintiff. The relevant facts follow.

Prior to jury selection, plaintiff's counsel informed the court of his intention to question the prospective jurors as to whether they or any of their close friends or family were ever insured by or had any business dealings with Merit Insurance Company (Merit). Defendant was insured with Merit at the time of the incident in question for a policy with limits of liability of $100,000 per person and $300,000 per occurrence. Plaintiff's

counsel filed an affidavit with the trial court stating that Merit had "thousands of policy holders in the Chicago area, and many employees, both office and outside investigators, and has extensive business dealings in and about the City of Chicago, County of Cook." This affidavit was furnished for the purpose of questioning the jurors concerning their connection with Merit, "* * * to insure that plaintiff's case can be tried by jurors who have no possible interest or bias." The affiant further stated that he would not inform or otherwise indicate to the jury that defendant was insured.

In response, defendant filed with the court an affidavit from the treasurer of Merit which stated that all of the issued and outstanding stock of Merit was held by Merit Financial Corporation, and owned equally by five individuals. Additionally, an affidavit by the vice-president of Merit was filed which stated at the time of trial 5,000 of Merit's 10,000 policyholders resided in Cook County and that Merit employed a total of 57 people—50 individuals in its offices and 7 "outside people." Defense counsel represented to the trial court that none of the individuals who owned stock in Merit Financial Corporation was on the venire called into the courtroom. After argument by counsel for both sides, the trial court allowed plaintiff's counsel to inquire of the prospective jurors in the manner requested. Questions were posed to nine of the veniremen in the presence of the entire array, seven of whom actually sat on the jury. None had any connection with the company. Defendant's repeated objections to these questions were overruled and his motions for a mistrial were denied. The following relevant evidence was subsequently adduced at trial.

### PLAINTIFF'S VERSION

On the evening of June 29, 1974, plaintiff and his friends Charles Picardi and Ralph Contacessi went out to dinner at about 11:30 p.m. After dining, they left the restaurant located at North Avenue and Austin in Chicago at about 1:15 a.m. Following a short stop at Picardi's house, the three proceeded south on Westchester Boulevard in Picardi's car at about 1:45 a.m. The occupants first noticed defendant's car at the intersection of Harrison and Westchester Boulevard when it pulled up behind them, flashed its bright lights and followed their car. Defendant stayed close to the rear of Picardi's car and repeatedly maneuvered alongside of them, and "played tag" as the car continued southbound. Due to the narrowness of the road, defendant's car did not or was unable to pass them. Picardi turned right on Roosevelt Road, heading west toward Mannheim Road, about one quarter of a mile away. Roosevelt Road consists of four lanes of traffic, two of which flow in each direction. The lanes are separated by a

corrugated median strip. After going about 1½ blocks on Roosevelt, Picardi pulled into the driveway of a GMAC building on the north side of the street slightly past the Westchester police station.

Plaintiff, who was riding in the front seat of Picardi's car, got out and ran toward the street in order to take down defendant's license plate number. Picardi and Contacessi also exited the car. Defendant's car had stopped in the middle of Roosevelt Road, but began to pull away. In an effort to get a better angle for viewing defendant's car, which was then moving toward the far right hand lane, plaintiff walked to the north end of the median strip. Defendant's car "cracked a wide U-turn" when it reached Mannheim and headed east on Roosevelt Road crossing the inner lane and angling toward plaintiff. Plaintiff momentarily took his eyes off defendant's car until he heard the sound of tires on the median strip and Contacessi yell "Look out." Defendant's car, which was approaching at 40-50 m.p.h., crossed the median strip and struck plaintiff. According to plaintiff, no one was in the eastbound lanes of Roosevelt Road at the time of the collision. Contacessi was somewhere north of plaintiff at this time and he had no idea where Picardi was.

## DEFENDANT'S VERSION

Defendant and his friend Mike Fahey were driving on 25th Avenue, about five miles from the scene of the accident on the night in question, when they encountered Picardi's car. At this time, Picardi's car was in front of defendant. Picardi attempted to prevent defendant from passing him, but defendant eventually succeeded in doing so. After passing Picardi's car, defendant's car was never again overtaken, yet Picardi chased his car, tailgated him and did not allow his car back into the proper lane of traffic. At one point in the chase, defendant heard a noise emanating from the left rear fender of his car. He thought he saw someone who was hanging out of the window of Picardi's car strike his car with an object.

When defendant reached the intersection of Westchester Boulevard and Roosevelt Road, he turned right, heading westbound. Fearing for his life, he pulled into the driveway of the Westchester police station. Shortly thereafter, defendant pulled out of the driveway going west on Roosevelt Road. Picardi's car was nowhere in sight. After travelling only a few feet from the police station, someone threw an object at his car which cracked its windshield. Defendant proceeded to Mannheim Road, made a U-turn, and drove toward the police station at a speed of about 35 m.p.h. At this time, he was attempting to brush glass from his face. Suddenly, a pedestrian appeared in this lane of travel. To avoid striking this person, defendant swerved to the left, crossed the median strip and hit plaintiff, causing him to fly up on the hood, fall off, and land near the north curb.

Defendant had seen plaintiff for the first time at the point of collision at which time he immediately applied the brakes. After the accident, defendant immediately pulled his car into the Westchester police station driveway.

Pictures taken by the Westchester Police Department after the accident showed that the windshield was, indeed, cracked on the passenger's side. One of the investigating officers stated that he inspected defendant's car at that time and found fresh breakage on the windshield. He also stated that there were landscaping rocks around the driveway of the nearby GMAC building which were "probably about the size of a hard-league baseball." The officer did not look for any stones or rocks in the area after the accident. Plaintiff denied that there were any stones or rocks in the area or that anyone in Picardi's car had thrown any objects at defendant's car. Plaintiff also denied that anyone in Picardi's car struck defendant's car, but defendant's father testified that he inspected the car shortly after the accident and found dents in the rear fender.

Opinion

We first examine defendant's contention that the trial court erred in permitting plaintiff's counsel to improperly inject references to defendant's insurer during voir dire and thereby prejudice the jury.

■■ Generally, evidence which informs the jury that the defendant in a personal injury action is insured against liability is inadmissible on grounds of relevancy. (E. Cleary, Illinois Evidence §10.28 (2d ed. 1963); Annot., 4 A.L.R.2d 761 (1949).) The rationale underlying this rule is twofold: (1) the fact that a party is insured can have no possible bearing on the question of his negligence; and (2) knowledge of such insurance on the part of the jury will probably result in a larger verdict than that awarded in the absence of such knowledge. (See R. Notman, *Insurance Nondisclosure: The "Hush-Hush" Game*, 53 Ill. B. J. 896 (1965).) However, the doctrine prohibiting disclosure of insurance is subject to several exceptions.

■■ One of these exceptions permits the plaintiff, within certain limitations, to interrogate prospective jurors on their voir dire as to their interest and relationship to insurance companies. (*Wheeler v. Rudek* (1947), 397 Ill. 438, 74 N.E.2d 601; *Dertz v. Pasquina* (1973), 15 Ill. App. 3d 470, 305 N.E.2d 54, *rev'd on other grounds* (1974), 59 Ill. 2d 68, 319 N.E.2d 12.) In *Wheeler*, our supreme court held that the right to conduct such an examination depends on the good faith of the plaintiff. This determination, to be made by the trial court, will be upheld on review absent an abuse of discretion. According to the court, "good faith" will not exist and the inquiry should not be made if there is "no reasonable probability of any of the jurors who are to be called being connected in some way or

interested in the company * * *." (397 Ill. 438, 422.) Plaintiff's affidavit in *Wheeler* supporting her request to question the jurors concerning the relationship to public liability insurers was found to be insufficient. In so ruling, the court reasoned as follows:

"The fact that defendant carried insurance was conceded, but to conform with the requirement of good faith it was necessary that there be something shown that would indicate there was a reasonable possibility that one or more of the jurors to be called in the case was interested in or related in some way to the Commercial Casualty Insurance Company. Such proof could not be made by the statement of conclusions, and to say that the company has 'numerous persons employed at its office' and that it 'has many other persons acting as investigators, agents and brokers in Cook county' is resting the claim on the merest shadow of possibility. The jurors were not named and no facts were stated showing that plaintiff knew who the jurors would be. There were no facts upon which a finding of good faith could be made as to the juror's connection with the insurance company. In the quoted part of the affidavit it is said affiant has 'reasonable grounds for believing' that persons who are interested in the company may be among the panel of jurors called into the jury box. Affiant did not set forth what her reasonable grounds were and without them the court had no way of determining whether she was justified in her belief that persons interested in the insurance company would be called into the jury box." *Wheeler*, 397 Ill. 438, 445, 74 N.E.2d 601, 604.

■■ In the instant case, we are likewise compelled to conclude that plaintiff's affidavit failed to show that there was a reasonable possibility that one or more of the jurors to be called was interested in or related to defendant's insurer. Plaintiff's affidavit stated in conclusory fashion that Merit had "thousands of policy holders," "many employees" and "extensive business dealings" in the Chicago area. This was refuted by defendant's affidavits stating that Merit only employed 50-60 people and was controlled by a corporation whose shares were owned by five individuals. Significantly, defense counsel assured the trial court that none of the prospective jurors called to the courtroom was one of those shareholders. Indeed, no juror ultimately questioned had any knowledge of the company. Based upon the foregoing, we believe that there were no facts upon which a finding of good faith could be made as to the juror's connection with Merit.

■■ Furthermore, we find that the harm caused by the references to Merit during voir dire were exacerbated by references to it evoked by plaintiff's counsel during the examination of plaintiff's father at trial. The following colloquy demonstrates that plaintiff's counsel intended to convey to the

jury that Merit, the company earlier referred to, was actually the company that insured defendant's automobile:

> "Plaintiff's Counsel: Did you ever take photographs of that automobile before the repairs were made?
>
> Mr. Rooney: The insurance company did.
>
> Plaintiff's Counsel: Were any photographs taken of the front of the automobile?
>
> Mr. Rooney: By the insurance company.
>
> Defense Counsel: Your Honor, may we have a side-bar please?"

Plaintiff's counsel claimed surprise at the witness' "unresponsive" answers to his questions at the ensuing side-bar. We recognize that references to insurance are permissible in some cases if unintentionally elicited by an unresponsive answer. (See *Seyferlich v. Maxwell* (1961), 28 Ill. App. 2d 469, 171 N.E.2d 806.) However, the record in the present case reveals that this witness provided the same response when plaintiff's counsel previously examined him along similar lines at his deposition. In addition, if counsel were surprised by the first response, he should have shifted his avenue of inquiry rather than adducing the second reference to the "insurance company" from the witness. In sum, we conclude that the jury was improperly informed as to defendant's insurance coverage.

While it is common knowledge that there is liability insurance covering most automobiles, jurors have no way of knowing whether a particular defendant is insured or if certain exceptions or limitations in the person's policy apply to the particular case. For this reason, the mention of defendant's insurance is disallowed in a personal injury suit. By the same token, an uninsured defendant is similarly forbidden to proclaim to the jury his financially vulnerable position. (*Humkey v. Hueslmann Quarry, Inc.* (1951), 343 Ill. App. 377, 99 N.E.2d 351.) Therefore, we find that evidence of defendant's insurer shall have no place in the retrial of this cause.

Defendant's second contention is that the trial court improperly directed a verdict in plaintiff's favor.

■■ Verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R. R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) When the evidence discloses a substantial factual dispute on either the issue of plaintiff's due care or defendant's negligence, or whether the assessment of the credibility of the witnesses may be decisive, the court may not direct a verdict. (*Polkey v. Phillips* (1980), 86 Ill. App. 3d 677, 408 N.E.2d 348.) The circumstance of a defendant's vehicle crossing into plaintiff's lane and resulting in a collision

does not establish negligence as a matter of law if there is evidence explaining the circumstance for coming into the opposite lane from which reasonable inferences favorable to the defendant could be drawn. See, e.g., *Graves v. Wornson* (1978), 56 Ill. App. 3d 873, 371 N.E.2d 692; *Wolfe v. Whipple* (1969), 112 Ill. App. 2d 255, 251 N.E.2d 77.

■■ We find that there is evidence in the present case presenting a substantial factual dispute as to defendant's negligence and that the trial court improperly removed this determination from the jury. Consistent with *Pedrick*, we briefly review the evidence concerning the events leading to the collision in a light most favorable to defendant, in order to show that his theory of the accident's cause is supported in the record.

Defendant testified that immediately before the accident occurred, he was proceeding eastbound on Roosevelt Road at about 35 m.p.h. toward the Westchester police station, and was brushing glass from his face from the recently shattered windshield. He was forced to swerve and cross the median strip when a pedestrian emerged in front of him. Although defendant immediately applied the brakes upon seeing plaintiff, he was unable to avoid striking him. This version of the accident finds corroboration in photographs introduced into evidence showing the damaged windshield. Additional testimony from the officer established that rocks or stones were located in the vicinity. This provided circumstantial support for defendant's testimony that his windshield was struck by a flying object.

While it is not our role to express an opinion as to the credibility of the evidence offered on defendant's behalf, it is evident that the cause of the accident was in dispute and should have been left to the jury's determination. For this reason, we find it unnecessary to discuss the issue of whether plaintiff's conduct and presence on the median strip establish his contributory negligence as a matter of law. Consequently, we hold that the trial court erroneously granted plaintiff's motion for a directed verdict.

For the reasons stated, this cause is reversed and remanded to the circuit court.

Reversed and remanded.

SULLIVAN, P. J., and MEJDA, J., concur.