JOHN STENGER, Indiv. and as Ex'r of the Estate of Frank E. Stenger, Deceased, Plaintiff-Appellee, v. GREGG A. GERMANOS, Defendant-Appellant.

First District (2nd Division)   No. 1—93—3164

Opinion filed August 16, 1994.

Coleman & O'Halloran, Ltd., of Chicago (Robert N. Hilbert, of counsel), for appellant.

Keith L. Young, of Chicago, for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

On March 23, 1989, plaintiff's decedent, Frank E. Stenger, was struck by an automobile being operated by defendant Gregg Germanos as Stenger crossed Arlington Heights Road near its intersection with Frederick Avenue in the Village of Arlington Heights. He later died as a result of the injuries sustained in the collision. Plaintiff John Stenger, who was decedent's brother, filed a two-count complaint in the circuit court grounded in the Wrongful Death Act (740 ILCS 180/0.01 et seq. (West 1992)) and Survival Act (755 ILCS 5/27—6 (West 1992)), and the action proceeded to trial before a jury.

Ms. Betty Minaglia testified that she was at the scene of the accident, which occurred directly in front of the church where she was a parishioner and where she was going that night for Holy Thursday ceremonies. At that location, Arlington Heights Road is a level, straight, centerline divided, four-lane north-south thoroughfare with the church on its east side and its parish center to its west. It was lit, but not with the bright halogen lights used in the City of Chicago. Although there was a marked crosswalk provided for pedestrians crossing at the corner of Arlington Heights Road and Frederick Avenue, there was no traffic control device there.

On the evening of the accident at around 7:20 p.m., there was a large crowd gathered in front of the parish center as Minaglia walked

toward the church. When she first saw decedent, he was about five feet north of the south crosswalk, walking from between the church and the school building, heading westbound toward the road, and she was on the east side of Arlington Heights Road standing on the steps of the church. She estimated that she was then between 100 to 125 feet from him. She described decedent's gait as very slow, but that he walked without the assistance of a cane or a walker.

Before the collision, Minaglia recalled that two vehicles on Arlington Heights Road were approaching from the south, one of which she later discovered was operated by defendant, who was in the centermost lane. The other auto to his right was half of a car length in front of his. From her years of driving, she was confident that at that moment, the two cars, which were proceeding at the same rate, were both under the posted speed limit of 30 miles per hour.

She testified that decedent continued walking, stepping off the curb and crossing the street outside the crosswalk. He never hesitated while stepping onto the pavement, but remained walking at the same slow pace. At some point, Minaglia realized that decedent would be hit, at which point defendant's vehicle was about six or seven car lengths away from him.

Although she did not observe the actual impact because the closer vehicle blocked her view, she heard it. She did not notice whether defendant's brake lights were on prior to impact, nor did she hear the squeal of the brakes until after the sound of the impact. The accident dented the windshield and the front fender on the driver's side of defendant's vehicle.

In order to expose any potential partiality Minaglia may have harbored in favor of defendant, plaintiff explored her post-accident relationship with him, over his objections. She disclosed that her 19-year-old son purchased auto insurance from him, at what she agreed was the best available rate. She also told the jury that defendant sent her family two tickets to a professional baseball game. She averred during cross-examination, however, that neither the tickets nor the business relationship with her son influenced her testimony in any way.

The evidence deposition of Officer William Newman of the Arlington Heights police was read to the jury because Newman had suffered an injury which prevented him from coming to court to testify in person. In his deposition he had offered his expert accident reconstruction opinion as to the speed at impact, which he based on the length of the skid mark, the weight of the vehicle and other pertinent factors. Defendant moved to exclude this opinion evidence

in light of the eyewitness testimony on that fact. The court provisionally granted this motion, reserving the right to allow the testimony in the event that the eyewitnesses' testimony on the speed of defendant's vehicle at impact proved unsatisfactory. When the issue was raised again at trial, the court once more sustained defendant's objection to Newman's opinion on speed, given Ms. Minaglia's testimony.

On the night of the occurrence, Newman went to the scene of the accident, and assisted by two other officers, he interviewed witnesses at the scene and took photographs and measurements of the boundaries of the accident as well as the length of the skid mark from defendant's tire, which was 88.3 feet long. Based on his measurements, Newman created a scale diagram of the accident, including the length and position of the skid mark. He also authenticated the photos taken of the scene which were published to the jury and later admitted into evidence over defendant's objection.

Sometime after the accident, Newman conducted tests on the vehicle to discover its braking power. He also wanted to estimate the speed at impact because he distrusted the eyewitnesses' estimates. He doubted that anyone could validly guess speed. His tests showed that the brakes worked well and that the vehicle decelerated evenly and did not pull to any side.

Defendant next took the stand as an adverse witness and he stated that on the night of the accident immediately prior to the incident, he was driving on Arlington Heights Road toward his office. He stated that after he turned onto the road and got up to speed, he checked his speedometer and when he saw that he was at 30 miles per hour, he kept his speed constant.

At trial, he testified that when he neared the church he saw a pedestrian, whom he tried to avoid by swerving and braking. But, in an earlier statement given to Officer Newman, he had said that he did not see the pedestrian until after striking him, and that it was only after the accident that he applied his brakes. He explained the inconsistency by blaming the earlier misstatement to Newman on the fact that it was taken soon after the accident while he was still traumatized.

Defendant presented the testimony of William Grafke, who at the time of the accident was heading southbound on Arlington Heights Road, proceeding at around 30 miles per hour. He recalled that the night was very dark. As he neared the church, he saw the headlights of two cars approaching him in the northbound lanes of the road. Then, about six car lengths to his front, he saw a pedestrian step off the curb and begin to cross. The pedestrian, who he

subsequently learned was decedent, was about 20 feet from the crosswalk, according to Grafke.

Decedent rapidly attempted to cross the road, apparently trying to avoid traffic. Moments later, Grafke saw the two cars approaching from the south take evasive action, but one nevertheless struck the pedestrian and his body bounced and rolled across the centerline.

This testimony was largely corroborated by Vincent Masterson, who was also on Arlington Heights Road at the time of the accident. He first noticed decedent when he was about halfway across the road, at which point Masterson was about 200 feet from him. He guessed that decedent was about 20 or 30 feet north of the crosswalk. He saw two cars which were nearly abreast in the northbound lane react to decedent when they were about 150 feet from him; they applied their brakes in unison and veered slightly to their right. In his opinion, defendant was travelling at approximately 20 miles per hour at impact.

The jury found damages in the amount of $306,000 and allocated 51% of the fault to defendant and 49% to decedent resulting in a judgment amount of $150,000. After the court rejected his post-trial motion, defendant filed a timely notice of appeal.

# I

In his first assignment of error, defendant charges that the plaintiff intentionally advised the jury that defendant had auto insurance and that this knowledge clouded its subsequent allocation of fault as well as its determination of damages. It is the rule of this State that to inform the jury as to whether or not the defendant in a negligence action carries liability insurance constitutes reversible error. (*Huber v. Seaton* (1989), 186 Ill. App. 3d 503, 507, 542 N.E.2d 464, 467, citing *Imparato v. Rooney* (1981), 95 Ill. App. 3d 11, 15, 419 N.E.2d 620; accord *Micklos v. Highsmith* (1986), 149 Ill. App. 3d 779, 500 N.E.2d 1154.) The reason given for the rule is that such evidence has no relevance to any issue being tried and, more significant, that armed with such knowledge, the jury would likely be inclined to give the plaintiff a higher award than it otherwise would, reasoning that, unlike the defendant, the insurance carrier with its "deep pockets" could well afford the larger amount. *Imparato*, 95 Ill. App. 3d at 15, 419 N.E.2d at 623.

Defendant moved *in limine* to prohibit "evidence, testimony or questions in *voir dire*, at Trial, or at any time before the jury, as to the existence or non-existence of insurance coverage in this case," which the court granted as a matter of course. Yet, according to defendant, it failed to apply its ruling whenever plaintiff elicited the word "insurance" during the trial.

The court allowed plaintiff to question eyewitness Bonita Minaglia with respect to her son's receipt from defendant of the above-mentioned tickets to a baseball game. She explained that defendant gave him the tickets in appreciation of his purchasing auto insurance from defendant, an insurance broker. Later, the court allowed plaintiff to emphasize indirectly defendant's occupation as an insurance broker by eliciting from one of the witnesses, William Grafke, that his preretirement occupation was that of a life insurance manager, again highlighting the word "insurance" before the jury. The final reference to insurance was when the court allowed plaintiff to testify that defendant told him on the day after the accident that when his vehicle struck decedent, he was on his way home from a party where he had celebrated passing the insurance brokers examination.

Defendant argues that by repeatedly hearing the word "insurance," the jury's attention was focused on the likelihood that defendant's liability was covered, which probably influenced its assessment of damages, and that this was especially true with regard to the references to his occupation as an insurance broker. He asserts that the jury would necessarily reason from that evidence that one in the insurance industry would be fully insured. He concludes that "the cumulative attack [poisoned] the jury's collective mind with insurance matters."

●1 We cannot subscribe to this multiple inference theory. Although it is true that insurance coverage is irrelevant and inadmissible, "not every mention of the word 'insurance' during a personal injury trial requires the court to declare a mistrial" (*Twait v. Olson* (1982), 104 Ill. App. 3d 191, 196, 432 N.E.2d 1244, 1249), nor, for that matter, to warrant reversal of its judgment. A reference to insurance is prejudicial only when it directly indicates that the defendant is insured. (*Fedt v. Oak Lawn Lodge, Inc.* (1985), 132 Ill. App. 3d 1061, 1070, 478 N.E.2d 469, 476.) In *Kitsch v. Goode* (1977), 48 Ill. App. 3d 260, 266, 362 N.E.2d 446, 451, the court exhaustively catalogued the law's early abhorrence of any mention of insurance, after which it noted:

> "With the passing of years, however, and with the almost universal prevalence of automobile liability insurance, has come an increasing judicial tolerance towards references to insurance. Where a finding of liability has a complete basis in the evidence and the damage award is reasonable, the courts will conclude that the jury was not prejudiced by the remark."

See also *Milwaukee Mutual Insurance Co. v. Wessels* (1983), 114 Ill. App. 3d 746, 750, 449 N.E.2d 897, 902 (accurately discerning that

"the mention of insurance is not quite the *bete noir* that it was a generation or more ago").

Here, defendant argues that when the jury was twice reminded that he was an insurance broker, he was prejudiced because the jury would likely assume that as a broker he would be sufficiently insured himself. But this tenuous connection fails to persuade us that it has any basis in either the jury's finding of liability or damages. Moreover, given the overwhelming popularity of auto insurance and especially since Illinois law requires all drivers in the State to carry minimal liability insurance (see 625 ILCS 5/7—601 *et seq.* (formerly Ill. Rev. Stat. 1991, ch. $95^1/_2$, 7—601 *et seq.*)), it is doubtful that the jury needed to know that he was an insurance broker before it would assume he was insured. Therefore, he can show no prejudice from the number of times plaintiff used the word "insurance." See *Galliher v. Holloway* (1985), 130 Ill. App. 3d 628, 638, 474 N.E.2d 797, 805 ("Because of the prevalence of automobile insurance ***, courts are less prone to view [references to it] as prejudicial"); see also E. Cleary, McCormick on Evidence § 201, at 481 (2d ed. 1972) ("[I]t seems likely today that in nearly all cases the jury will either be informed of the fact of insurance or will consciously assume that the defendant is so protected"); 2 J. Wigmore, Evidence § 282a, at 146 (3d ed. 1940) (referring to the traditional fear of the word "insurance" as "a piece of hypocritical futility"), both cited in *Kitsch*, 48 Ill. App. 3d at 266, 362 N.E.2d at 451.

In addition, when plaintiff referred to the fact that defendant gave Ms. Minaglia's son tickets to a Cubs game and that he sold him auto insurance at the best rate available, this evidence was probative of her potential partiality toward defendant. It is beyond dispute that a party is entitled to explore a potential bias a presumably impartial witness may have in favor of one party or against the other. (See, *e.g., Winn v. Inman* (1983), 119 Ill. App. 3d 836, 457 N.E.2d 141 (holding that circuit court should have allowed an inquiry which would have established a close friendship between witness and defendant); see also 1 J. Strong, McCormick on Evidence § 39, at 130 & n.2 (4th ed. 1992) ("Partiality, or any acts, relationships or motives reasonably likely to produce it, may be proved to impeach credibility").) In her deposition, Minaglia had indicated that defendant gave her the tickets in appreciation of her appearing at the traffic court proceedings which resulted from the accident. She explained for the first time at trial that the tickets were a bonus for her son for his purchase of insurance.

Since the reason for which the question was put was a proper one (see *Schuman v. Bader & Co.* (1922), 227 Ill. App. 28, 31 (stating that

evidence of compensation for coming to court received by a witness from a party is competent as bearing on the credibility of that witness)), plaintiff cannot be faulted simply because the witness gave an unexpected answer which again reinformed the jury that defendant was an insurance broker. In any event, in view of the communal knowledge of insurance discussed above, this information, like the other allusions to defendant's career, can hardly be assumed to have affected the jury. Thus, defendant suffered no prejudice by the references.

## II

●2 Defendant next raises multiple issues with respect to the evidence deposition testimony of Arlington Heights police officer William Newman, who was the officer in charge at the scene of the accident, and the post-accident gathering of evidence there. First, he argues that the court violated its own rule granted *in limine* by allowing Newman to testify as an expert in accident reconstruction. Generally, an expert should not be allowed to reconstruct an accident or posit, for example, the speed of the autos at impact, where there are eyewitnesses who can give direct testimony on those matters which are not beyond the understanding of the average juror, such as the speed of a vehicle. (*Levin v. Welsh Brothers Motor Service, Inc.* (1987), 164 Ill. App. 3d 640, 518 N.E.2d 205.) The following answer, which was in response to plaintiff's question as to why he ran braking tests, is the alleged expert opinion given by Newman:

"Because I would personally feel that I think witnesses have no basis for estimating speed, much the same as a police officer. I just can't look at a car and say he's going 45 miles per hour."

Clearly, he was not estimating the speed of defendant's vehicle, but only stating something that should be obvious to all: that it is difficult for anyone to guess accurately the rate of speed at which a vehicle is travelling. Thus, the court did not admit unneeded reconstruction testimony.

The second alleged error in Newman's testimony was his relating that the skid mark from defendant's auto measured 88.3 feet in length. Defendant argues that this was cumulative since the photos of the scene and the testimony of the witnesses were adequate to inform the jury of the extent of his skid prior to impact; thus, it again was reconstruction testimony which should have been excluded.

Defendant's argument is meritless. In *Nolan v. Elliott* (1989), 179 Ill. App. 3d 1077, 535 N.E.2d 1053, the court held that an emergency medical technician (EMT) who was at an accident scene could testify as to the length of skid marks. The court specifically rejected a

contention that this was impermissible reconstruction testimony. It held instead that the EMT was testifying only to his personal observations, which he was entitled to do. Like the court in *Nolan*, we find no error in Newman's attesting to his own observations.

Next, defendant complains about a scale diagram prepared by Newman and offered into evidence. He also takes issue with the introduction of photos Newman took of the scene, which he claims depicted decedent's remains after the accident, and thus, by their gruesomeness, inflamed the jury's passion.

•3 As to the former, it is well settled that the admissibility of diagrams is addressed to the sound discretion of the trial court, and a decision to admit such evidence will not be disturbed unless its exercise is clearly abused. (*Burke v. Toledo, Peoria & Western R.R. Co.* (1986), 148 Ill. App. 3d 208, 213, 489 N.E.2d 682, 686; *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 706, 450 N.E.2d 1199, 1202.) There is nothing in the record before us to indicate that the diagram at issue did anything other than to assist the jury in visualizing the scene of the accident, a permissible and, in fact, paradigmatic use of demonstrative evidence. *Hargrove v. Neuner* (1985), 138 Ill. App. 3d 811, 818, 485 N.E.2d 1355, 1361 ("The diagram undoubtedly gave the jury a clearer picture of the events in question so that they could more intelligently consider the testimony of [the witnesses]").

With respect to the allegedly gruesome and inflammatory photos of the scene, defendant did not include them within the record. Because of this, we have no way of determining whether or not they are in fact so gruesome as to have prejudiced the jury against him. Accordingly, by his failure to include the photos complained of, defendant must be deemed to have waived this issue. See *Perez v. Hartmann* (1989), 187 Ill. App. 3d 1098, 543 N.E.2d 1023 (declining to consider whether the defendant was prejudiced by the court's allowing the jury to take EKG strips into the jury room since they were not included in the record on appeal).

Moreover, even if we were to disregard the waiver and consider the issue, it is unlikely that defendant could persuade us that the photos prejudiced his defense. In *Bullard v. Barnes* (1984), 102 Ill. 2d 505, 468 N.E.2d 1228, the supreme court stated that a photograph of a decedent, even though gruesome or inflammatory, will be admitted so long at it is sufficiently probative. It also emphasized that, as always, the assaying of its probity versus its prejudicial effect is entrusted in the first instance to the discretion of the trial court, with which this court may not interfere unless it was abused. In the instant case, the circuit court admitted the photos to show the jury

the accident scene, and again to assist its comprehension of the witnesses' description of the scene. Since this has been held to be a proper use of photographic evidence (*Pace v. McClow* (1983), 119 Ill. App. 3d 419, 458 N.E.2d 4), the court did not abuse its discretion by allowing the jury to see the disputed photos.

## III

The third issue presented addresses the constitutionality of section 2—1107.1 of the Code of Civil Procedure. (735 ILCS 5/2—1107.1 (West 1992).) Defendant maintains that the act constitutes a legislative usurpation of an inherent judicial function, namely, the regulation of the conduct of trials; thus, it violates the separation of powers clause of our constitution. Ill. Const. 1970, art. II, § 1.

Section 2—1107.1 provides:

> "In all actions on account of bodily injury or death or physical damage to property based on negligence, or product liability based on strict tort liability, the court shall instruct the jury in writing that the defendant shall be found not liable if the jury finds that the contributory fault of the plaintiff is more than 50% of the proximate cause of the injury or damage for which recovery is sought." (735 ILCS 5/2—1107.1 (West 1992).)

In *Gratzle v. Sears, Roebuck & Co.* (1993), 245 Ill. App. 3d 292, 613 N.E.2d 802, the court interpreted this provision of the Code of Civil Procedure as imposing a mandatory obligation on circuit courts to inform the jury of the consequences of its allocation of fault, even in those instances where an instruction to that effect is not tendered by a party. In fact, the failure of the court in that case to so charge the jury *sua sponte* resulted in a reversal of its judgment. Accordingly, the question posed in the case at bar is whether the legislature overstepped its bounds by ordering courts in most tort actions to instruct a jury in a particular manner, an area which has been traditionally overseen by our supreme court. See 134 Ill. 2d R. 239 (giving general guidance to the circuit courts on the contents of and procedure for jury instructions).

●4 In *People v. Novak* (1993), 242 Ill. App. 3d 836, 611 N.E.2d 1203, the court considered an identical challenge to section 115—10(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 115—10(c) (now 725 ILCS 5/115—10(c) (West 1992))), which mandates that, where applicable, the circuit court must instruct the jury that it is to assess the weight to be given to an out-of-court statement made by a juvenile victim of sexual abuse, and that it was to make that evaluation based in part on the declarant's age and maturity, as well as other relevant factors. After first noting

that the legislature may pass laws governing judicial practices so long as they do not unduly infringe upon the powers of the court, this court held that the command in section 115—10 did not come anywhere near encroaching upon an exclusive judicial right or power.

Moreover, our supreme court has held that where the legislature grants a right which neither existed at common law nor was granted by the constitution, it is free to define the parameters and application of its purely statutory creature. (*People v. P.H.* (1991), 145 Ill. 2d 209, 582 N.E.2d 700.) Here, the statute at issue relates to modified comparative negligence, a statutory scheme which displaced the common law rule of pure comparative negligence first announced in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886. With that enactment, the legislature granted the defendants in a tort action the previously unrecognized right to be free from liability in those instances where the plaintiff is more than 50% responsible for her injuries. It merely conditioned this grant with the proviso that this fact must be known by the members of the jury while they deliberate. Since the legislature is acting within its sphere when it places conditions on its statutorily created right (see *Strukoff v. Strukoff* (1979), 76 Ill. 2d 53, 389 N.E.2d 1170 (holding that the mandatory bifurcated hearing procedure in a marriage dissolution action was not an infringement on judicial primacy, but rather was reasonably designed to implement and to define the statutorily-dependent right of divorce)), section 2—1107.1 does not trespass on an exclusive judicial preserve. *Cf. DeLuna v. St. Elizabeth's Hospital* (1992), 147 Ill. 2d 57, 588 N.E.2d 1139 (holding that section 2—622 of the Code of Civil Procedure, which requires a plaintiff or her attorney in a healing arts malpractice action to append, *inter alia*, a report of a medical professional certifying the merits of the claim to the complaint, does not unduly infringe upon the inherent and exclusive power of the trial court to judge the legal sufficiency of such a complaint based on the fact alleged).

## IV

In his final challenge to the judgment against him, defendant urges that the combined weight of the trial errors discussed above as well as those cited in his post-trial motion denied him a fair trial. In making this argument, he expressly incorporates by reference his post-trial motion, which was appended to his brief.

•5 As to the arguments raised in his post-trial motion, we may freely disregard the assertions raised there since, under Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)), the appending of a post-trial motion to an appellate brief is not an appropriate way to bring

before this court the matters contained therein. As Justice Linn wrote in *Northern Trust Co. v. St. Francis Hospital* (1988), 168 Ill. App. 3d 270, 283, 522 N.E.2d 699: "A reviewing court is entitled to have briefs submitted that are articulate, organized, and that present cohesive legal argument in conformity with supreme court rules." Any issues presented in a manner with less than that minimal dignity should be ignored. (*In re Application of Anderson* (1987), 162 Ill. App. 3d 815, 516 N.E.2d 860.) Thus, we will deem the arguments raised by defendant only in his post-trial motion to be waived on appeal.

●6 With respect to the cumulative weight of the errors properly asserted and discussed above, it must be recalled that none of them was found to have actually been error. We have held that where a party fails to demonstrate any error, there is no reason for us to consider any possible cumulative effect. (*People v. Abrams* (1994), 260 Ill. App. 3d 566, 631 N.E.2d 1312.) As the supreme court has explained: "The whole can be no greater than the sum of its parts, and defendant has failed to demonstrate anything approaching reversible error in the myriad of arguments offered to justify a new trial." (*People v. Albanese* (1984), 102 Ill. 2d 54, 82-83, 464 N.E.2d 206, 220.) Because we find that defendant received a trial which fairly fixed his fault and liability, the judgment of the circuit court is affirmed.

Affirmed.

DiVITO, P.J., and McCORMICK, J., concur.