OSCAR MEDLEY *et al.*, Plaintiffs, v. LARRY L. STRONG *et al.*, Defendants-Appellees (Carolyn Medley, Plaintiff-Appellant).

First District (4th Division)   No. 1—88—1772

Opinion filed June 21, 1990.

James H. Canel, Ltd., of Chicago (James H. Canel, of counsel), for appellant.

Cassiday, Schade & Gloor, of Chicago (John N. Seibel, Paul W. Carroll, and Judith A. Schieber, of counsel), for appellees Paul Carryon and Williams Clinic, Ltd.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Gridgman, Michael J. Wagner, and Corinne Seither, of counsel), for appellee Hyde Park Hospital.

Peterson, Ross, Schloerb & Seidel, of Chicago (William K. McVisk and Kathleen A. Brosnan, of counsel), for appellee Mercy Hospital and Medical Center.

Wildman, Harrold, Allen & Dixon, of Chicago (Edward Butt and Mary Periolat, of counsel), for appellees Larry Strong and Urology Associates.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Carolyn Medley, seeks damages against defendant doctors and hospitals for their alleged negligence in treating her lover and companion of 10 years, Oscar Medley. In the course of his medical treatment for a condition of the penis, complications set in that resulted in its amputation. She seeks to recover damages for loss of consortium.

The trial court granted defendants' motion to dismiss her claim on the grounds that she lacked legal capacity, under section 2—219(a)(2) of the Code of Civil Procedure, to maintain the action. (Ill. Rev. Stat. 1987, ch. 110, par. 2—619(a)(2).) On appeal, she argues that under general, common law principles of tort liability, and in light of the increasing numbers of persons who cohabit without marriage, she should be allowed to maintain her action despite her lack of marital status.

We affirm the trial court.

BACKGROUND

Oscar and Carolyn Medley had been living together and representing themselves as married for 10 years before Oscar's injuries. In August 1986 Oscar sought treatment for priapism, which is defined as an abnormal, painful, and continued erection of the penis due to disease. He was referred to defendant Larry Strong, M.D., an employee of defendant Urology Associates. He was admitted to defendant Hyde

Park Community Hospital, where he stayed until September 5, 1986. According to the complaint, Dr. Strong failed to perform surgery to reduce the priapism and instead attempted manual compression of the penis and then attempted further compression by using a blood pressure cuff.

During his stay in the hospital, Oscar Medley developed nonviable tissue and ulceration of the penis. According to the complaint, Dr. Strong did not intervene and treat the condition.

Defendant Evelyn Currie, M.D., a hematologist, consulted on the case. She allegedly failed to appreciate the significance of laboratory data and failed to give necessary information to nursing and medical personnel who were treating Medley. Plaintiff alleges that she recommended or ordered medical approaches that were based on a "misassessment" of Medley's medical, clinical, and laboratory history.

Plaintiff further alleges that the nurses responsible for Medley's treatment were negligent in using a blood pressure cuff on his penis, which contributed to and aggravated the injury. In addition, the nurses allegedly failed to notify the treating physicians of the developing infection in Medley's penis. Although Medley's white blood cell count had become elevated, he was discharged from the hospital without further laboratory testing and without proper medication and instruction for follow-up care.

Plaintiff further alleges that on September 20, 1986, Medley was admitted to defendant Mercy Hospital and Medical Center, under the care of Dr. Paul Carryon, who was employed by defendant Williams Clinic. Medley suffered from respiratory distress and "necrotic penis." He was discharged on September 30, 1986. According to the complaint, during his stay at this hospital he was not given appropriate treatment and testing, and his doctor failed to offer any treatment when Medley developed a second opening on the underside of the penis, on September 26.

Dr. Carryon called upon Dr. Currie, the same hematologist who previously had examined Medley. According to plaintiff, she again failed to appreciate the significance of the data and recommended inappropriate treatment.

The complaint alleges negligence on the part of all named defendants, as a result of which Medley underwent a penectomy, or surgical amputation, and additional surgeries and treatments. His claimed damages and losses are not in issue in this appeal, however; it is Carolyn Medley's claim for loss of consortium that must be considered.

OPINION

■ Carolyn Medley's claim is for an injury that is recognized in Illinois and other States as arising out of the marriage relation. In fact, the case on which she relies, *Dini v. Naiditch* (1960), 20 Ill. 2d 406, 170 N.E.2d 881, recognized that "the husband and wife have equal rights *in the marriage relation* which should receive equal protection of the law." (Emphasis added.) (20 Ill. 2d at 424, 170 N.E.2d at 889-90.) The court stated that "[c]onsortium *** includes, in addition to material services, elements of companionship, felicity and sexual intercourse, all welded into a conceptualistic unity." 20 Ill. 2d at 427, 170 N.E.2d at 891.

We agree with Carolyn that but for the lack of a marriage license, she would state a viable cause of action and could recover whatever amount of damages she could prove were proximately caused by defendants' negligence.

■ ■ We do not agree, however, that we can expand common law tort principles to allow her a cause of action that is defined in marital terms. Since 1905, Illinois has not recognized common law marriage (see Ill. Rev. Stat. 1987, ch. 40, par. 214), and the Illinois Supreme Court has expressly reaffirmed the State's strong, continuing interest in the institution of marriage. (*Hewitt v. Hewitt* (1979), 77 Ill. 2d 49, 394 N.E.2d 1204.) The statutory rights of married people include interests in marital property, support obligations, inheritance rights, and the entitlement to sue for wrongful death of the spouse. Unmarried cohabitants do not have these protections, either by statute or by common law, since *de facto* marriages are not legally recognized.

■ In *Hewitt v. Hewitt*, the Illinois Supreme Court held, in the clearest possible terms, that unmarried cohabitants (even those in long-term, stable relationships) are entitled to no legal protection for claims that depend on the cohabitation itself. The court held that the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 101 *et seq.*) embodied the legislative preference for marriage by refusing to accord legal status to claims for marriage-like relationships that would, in effect, reactivate common law marriages.

The result in *Hewitt* was particularly harsh in light of its facts. Mrs. Hewitt had devoted 15 years of her life to establishing a home and raising the parties' three children. She had borrowed money from her parents and otherwise facilitated her "husband's" ability to develop a lucrative practice of pedodontia. Even the parents of the parties believed that the two were married. Since they had not complied with the marriage laws of the State, however, the court held that

Mrs. Hewitt could not claim any property rights based on the cohabitational relationship itself. Nor could she enforce an express oral contract. In a discussion of contract principles, moreover, the court noted that agreements based on sexual services are void for want of legal consideration and that Illinois courts would not enforce what in effect are private contracts for marriage-like relationships.

Carolyn attempts to distinguish *Hewitt* as involving claims between the cohabiting parties only, as distinguished from tort claims against third parties. She states that traditional principles of tort liability are satisfied because she is a foreseeable plaintiff to whom the defendants owed a duty of care.

■ We believe that this approach ignores the legislature's preemptive regulation of rights and obligations integral to marriage and marriage-like relationships. We also find unpersuasive Carolyn's attempt to narrow the consortium claim—and thus the issue under review—to the point where we look only at the sexual injury as a distinct injury to Carolyn's relationship with Oscar and pretend that the public policy concerns regarding the integrity of marriage do not apply. Her argument that the times have changed and the laws have not kept up with the changes may be well taken, but they are not ultimately relevant in this case. The object here is not to reexamine Illinois public policy on marriage as opposed to other relationships or to slay the draconic notion of women as chattel. That already has been done, in *Hewitt* and in *Dini v. Naiditch*, respectively.

Certainly, statistical data may reveal that many people in the United States do, have, or will cohabit without marriage. In Illinois, tort law gives them whatever protections and rights that are commonly enjoyed by all other people, except for torts that are specifically designed to compensate for injuries to the relationship between spouses.

Moreover, loss of consortium damages belong to the restricted group of claims that arise from injuries to other persons, rather than from direct, physical injury to the claimants themselves. We do not mean to denigrate Carolyn's own, separate suffering or to imply that her injury is insignificant. Claims involving loss of consortium or loss of society should not be indiscriminately expanded, however; otherwise, all who claim a sexual relationship, friendship, or some other close relationship with the injured or deceased party could recover damages for their losses. See, *e.g.*, *Childers v. Shannon* (1982), 183 N.J. Super. 591, 595, 444 A.2d 1141, 1142-43 ("[I]t is not the function of [the] court to sift through the myriad relationships of a party in a negligence action to determine which of those near and dear have suf-

fered an injury"); see *Dralle v. Ruder* (1988), 124 Ill. 2d 61, 529 N.E.2d 209 (giving policy reasons for limiting consortium claims in parent/child context).

The only apparent limit on Carolyn's theory is that the claimant has regular sexual relations with the person whose sexual abilities are impaired through the negligence of a third party. If we recognize such claims, outside the context of marriage, we would be creating a situation in which multiple partners of an injured person may sue. We hesitate to create new classes of claimants, under the rubric of "foreseeable plaintiffs," as Carolyn suggests. Whether all potential plaintiffs in such cases would be "foreseeable" or not is open to question; legally married spouses, in contrast, are foreseeable plaintiffs by definition.

Even if we were to hold that Carolyn is a foreseeable plaintiff under the facts of this case, we question the soundness of permitting an action to be based on a tort duty that has been found only in the context of interspousal relationships. The more a relationship resembles a long-term, stable marriage, the more it looks like common law marriage, which is legally invalid in Illinois. The more a relationship is viewed as purely sexual, the more plaintiffs may emerge from the bedrooms into the courts. We doubt, in fact, that common law principles support any relief based on loss of sexual services, given historical prohibitions against these relations outside of marriage. Current codifications of such laws even criminalize some types of sexual activities. Therefore, whether we focus narrowly on sexual injury or more broadly on loss of companionship and material services, we find no support for creating a tort claim based on lost sexual services.

Other courts have uniformly barred nonmarried partners from bringing loss of consortium claims. The reasoning of one California court, that such claims are proper if the cohabital relationships are "stable and significant" (*Butcher v. Superior Court* (1983), 139 Cal. App. 3d 58, 188 Cal. Rptr. 503), has been rejected by more recent California decisions. (*E.g., Elden v. Sheldon* (1988), 46 Cal. 3d 267, 250 Cal. Rptr. 254, 758 P.2d 582; *Gonzales v. Hudson* (1988), 200 Cal. App. 3d 45, 245 Cal. Rptr. 753, *transferred with directions* (1988), 252 Cal. Rptr. 816, 763 P.2d 479.) We are aware of no other jurisdictions that allow such claims, and many that reject them. *E.g., Briggs v. Butterfield* (1984), 104 A.D.2d 626, 479 N.Y.S.2d 758; *Haas v. Lewis* (1982), 8 Ohio App. 3d 136, 456 N.E.2d 512; see Annot., *Action For Loss of Consortium Based on Nonmarital Cohabitation*, 40 A.L.R.4th 553 (1985).

Carolyn's argument that many people live together or have rela-

tions outside of marriage does not, therefore, persuade us that this fact alone justifies the recognition of such a tort. If we were to adopt the "evolving social reality" theory advanced here, we would be usurping the legislative function to an unprecedented degree. Judicial modification of judge-made law is appropriate where the purpose of the modification is to correct mistakes or entomb anachronisms. For example, in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 13, 374 N.E.2d 437, the Illinois Supreme Court recognized that America's historic, blanket ban on contribution among tortfeasors was based on an erroneous expansion of the original English rule that no *intentional* tortfeasor should be allowed to recover against others for the consequences of his deliberate acts. (See also *Gerill Corp. v. Jack L. Hargrove Builders, Inc.* (1989), 128 Ill. 2d 179, 203, 538 N.E.2d 530.) Another example is *Dini v. Naiditch* (1960), 20 Ill. 2d 406, 170 N.E.2d 881. There the supreme court condemned the historical view of women as chattel, which let their male "owners" recover compensation for injuries to their wives, as for damaged goods. The court simply raised women's rights for loss of consortium to the level of preexisting rights of men.

More to the point, the Illinois Appellate Court has already barred a claim for loss of consortium when the cohabitants were unmarried at the time of the alleged injuries, but intended to marry and did in fact marry at a later time. (*Sostock v. Reiss* (1980), 92 Ill. App. 3d 200, 415 N.E.2d 1094.) In *Sostock*, the husband sought damages for loss of consortium dating from the time of the marriage. The court rejected this claim because he was not the lawful spouse at the time the accident occurred.

We find no basis to depart from the reasoning of *Sostock* and the other pertinent authorities and conclude that the trial court properly dismissed those counts of the complaint that consisted of Carolyn Medley's loss of consortium claims. Accordingly, we affirm.

Affirmed.

McMORROW, P.J., and JOHNSON, J., concur.