# Illinois Official Reports

## Appellate Court

*The Private Bank v. Silver Cross Hospital & Medical Centers*,
2017 IL App (1st) 161863

| | |
|---|---|
| Appellate Court Caption | THE PRIVATE BANK, as Guardian of the Estate of Raymond Reynolds III, a Disabled Person, and AMANDA LESSNER, Individually and as Guardian of the Person and Next Friend of Raymond Reynolds III, a Disabled Person, Plaintiffs, v. SILVER CROSS HOSPITAL AND MEDICAL CENTERS; MICHELLE ALLING; MIDWEST RESPIRATORY, LTD.; PHILIP LEUNG, M.D.; ROBERT KOZIOL, D.O.; MIDSTATE ANESTHESIOLOGISTS, LTD.; ALLIED ANESTHESIA ASSOCIATES, S.C.; HEDGES CLINIC, S.C.; MICHAEL DEMAERTELAERE; EM STRATEGIES, LTD.; and ANTHONY MURINO, D.O., Defendants (Amanda Lessner, Individually and as Guardian and Next Friend of Raymond Reynolds III, a Disabled Person, Plaintiffs-Appellants; EM Strategies, Ltd., and Anthony Murino, D.O., Defendants-Appellees). |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-1863 |
| Filed | December 15, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-10705; the Hon. Edward Harmening, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal    Martin J. Oberman and Keith L. Davidson, both of Chicago, for appellants.

Vogt & O'Kane, of Chicago (Robert P. Vogt and David A. Brueggen, of counsel), for appellees.

Panel    JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Rochford concurred in the judgment and opinion.

## OPINION

¶ 1    In this medical malpractice action against several defendants, plaintiffs alleged that hospital patient Raymond Reynolds III, suffered a cardiac arrest and catastrophic brain damage because, *inter alia*, defendant Dr. Anthony Murino delayed responding to an emergency call for treatment. Also, plaintiff Amanda Lessner, who was Reynolds's fiancée, alleged claims for loss of consortium and loss of a chance to marry.

¶ 2    Prior to trial, the court dismissed Lessner's loss of consortium and chance to marry claims based on her failure to establish a cause of action upon which relief may be granted. After the conclusion of plaintiffs' case at the jury trial, the trial court granted a motion for a directed verdict in favor of defendants Dr. Murino and his employer, EM Strategies, Ltd. (EMS), which managed the hospital's emergency department. The case proceeded to verdict as to several codefendants, who ultimately settled with plaintiffs and are not parties to this appeal.

¶ 3    On appeal, plaintiffs argue that (1) the trial court erred in granting the directed verdict because they presented circumstantial evidence from which the jury reasonably could have concluded that Dr. Murino delayed leaving the emergency room (ER) to treat Reynolds in the intensive care unit (ICU), (2) the trial court erred in barring evidence about EMS's medical malpractice insurance coverage, and (3) this court should recognize Lessner's claims for loss of consortium and loss of chance to marry because she and Reynolds were in a long-term committed relationship for many years and their scheduled wedding date was less than 20 days away when defendants' negligence prevented Lessner and Reynolds from marrying.

¶ 4    For the following reasons, we affirm the judgment of the Cook County circuit court.

## I. BACKGROUND

¶ 6    In September 2010, Reynolds was suffering from severe pneumonia and was admitted to Silver Cross Hospital. His condition deteriorated, and he was transferred to the ICU. On September 22, an intubation procedure was performed on him, followed by a portable chest X-ray at 3:40 a.m., which was standard procedure. The digital X-ray image was transmitted to an offsite radiology service for interpretation.

¶ 7    According to the offsite service's computer automated time stamps of its electronic records, the offsite service received the X-ray at 3:52 a.m., and the radiologist opened the film to read it at 3:55 a.m. The X-ray revealed a tension pneumothorax, which can be fatal if not treated immediately. A pneumothorax is a collection of free air in the chest outside the lung from a hole in the lung or chest wall that causes the lung to collapse. A tension pneumothorax refers to the compression of the chest structures that results when the lung continues to leak air. The radiologist dictated a report, which was immediately sent to the hospital, and the offsite service and radiologist attempted to arrange a conference call with Reynolds's treating physician.

¶ 8    According to the telephone company's computer records, the following events occurred at the specified times. Specifically, at 3:57 a.m., the radiologist telephoned the ICU. The radiologist spoke to ICU nurse Michelle Alling about his findings. At 3:58 a.m., Reynolds's pulmonologist, who was at home, telephoned nurse Alling. Alling testified that the pulmonologist gave her an order to call the attending, who was Reynolds's family doctor, to get a consult so a trauma surgeon could come in and place a chest tube. Although Alling's telephone call with the pulmonologist lasted until 4:03 a.m., she did not wait until that call ended to seek help from others in the ICU to find a surgeon or doctor to come to the ICU. Alling had informed her charge nurse about the tension pneumothorax. Consequently, while Alling was telephoning whoever was on call that night for the attending's group and trying to get a trauma surgeon to come in, the charge nurse called probably the house supervisor, who would have information about who was available in the hospital to come to the ICU. The ICU nurses understood the significance of a tension pneumothorax, so the objective was to reach out and find the physician who could get to the ICU the fastest to place the chest tube. Alling did not know who in the ICU telephoned the ER about Reynolds's tension pneumothorax or when. She learned after the fact that someone had telephoned the ER.

¶ 9    The ICU's telephone call to the ER for assistance with the tension pneumothorax was characterized as a non-code blue emergency. A code blue was a common term to indicate that a cardiopulmonary arrest was happening to a hospital patient and treatment providers were required to rush to a specific location and begin immediate resuscitative efforts. Plaintiffs' evidence at trial did not show who or when someone in the ICU made that telephone call to someone in the ER.

¶ 10    Dr. Murino was the lone ER physician on duty that night, and he had 16 ER patients under his care at the time. Under the ER's triage system, the nurses initially classified patients in order of severity and level of necessary care. Triage was a fluid, ongoing process, and Dr. Murino checked computers to assess what was happening on a continual basis and ensure that everything was okay. Also, ER staff would inform him of changes in patients' conditions. The hospital's policy and the standard of care required ER physicians to assess their patients to ensure their safety before leaving the ER for other parts of the hospital to treat inpatient emergencies. This meant the ER physician had to (1) determine that no ER patient suffered from a condition equal to or more serious than the hospital inpatient, (2) discuss the ER patients' treatment plans with the ER nurses, and (3) observe any high risk ER patients before leaving the ER.

¶ 11    Dr. Murino testified that when the ICU telephones the ER, the call could be answered by anyone, like a secretary or someone at the charge nurse's desk; it depended on who was around. If everyone in the ER was in a room helping someone or starting an IV, the call could

bounce around. When a call comes from the ICU to the ER, it should be triaged; someone should be made aware of it and then Dr. Murino "hopefully" would be made aware of it as soon as possible. Dr. Murino testified that he did not have an independent memory of Reynolds's treatment or the events and patients in the ER during the time in question. Dr. Murino never spoke to anyone in the ICU and did not recall when or from whom he received the information about the ICU's non-code blue call about Reynolds's tension pneumothorax. Moreover, plaintiffs did not present any witness or other direct evidence to show who in the ER initially received the information about the tension pneumothorax, what time that information was received, and what time it was communicated to Dr. Murino.

¶ 12    At 4:10 a.m., Reynolds suffered a cardiac arrest, and nurse Alling hit the button in his room to issue a code blue page through the hospital's public address system. Dr. Murino recorded in his notes, which were written at approximately 4:45 a.m. on the date at issue, that he was leaving the ER as the code blue page sounded. He testified that he did not recall how much time had elapsed between when he was informed about the ICU's non-code blue request for assistance and when he left the ER, but he remembered that he was moving as fast as he could.

¶ 13    Dr. Murino arrived at Reynolds's bedside and began treating him at 4:12 a.m. by inserting a needle and then a chest tube into his chest. Dr. Murino and the code team continued to resuscitate Reynolds but could not restore his heartbeat until 4:17 a.m. By that time, the lack of oxygen to Reynolds's brain had caused major permanent brain damage.

¶ 14    About six hours later, nurse Alling wrote her notes about Reynolds's treatment. According to Alling's testimony, her primary focus was treating Reynolds's serious condition, so she did not have the extra time necessary to write her notes contemporaneous with his treatment. In these situations, she usually looked at a clock if possible and jotted down the times on pieces of paper as events unfolded. Afterwards, she would sit down and use those pieces of paper to write her notes, and then would discard those pieces of paper. Consequently, the times of the occurrences listed in her notes were simply her best guess or rough estimate. Her notes were not intended to record specific and accurate times about a patient's treatment but rather were meant to inform the next shift about what had occurred before their arrival.

¶ 15    According to nurse Alling's notes, at 3:50 a.m., the offsite radiologist called her and reported that Reynolds had signs of a tension pneumothorax. The pulmonologist was also on the phone and talked to the radiologist. At 3:55 a.m., the pulmonologist was re-paged, and the attending physician on call that night was called to get a consult for a trauma surgeon to come in and place a chest tube. The "ER Dr. [was] paged also." At 4 a.m., the family was informed of Reynolds's condition. At 4:08 a.m., his heart rate started to drop, and the code blue was called at 4:10 a.m.

¶ 16    After September 22, Reynolds was diagnosed with anoxic brain injury with spastic quadriparesis and episodes of seizure activity. His disabilities included a motor speech disorder, visual defects, decreased coordination, and an inability to independently conduct the activities of daily living. Reynolds was unable to marry Lessner, his girlfriend of 16 years and fiancée. Their wedding, scheduled for October 10, 2010, never took place. The probate court appointed Lessner as the guardian of Reynolds's person and appointed The Private Bank as the guardian of his estate.

¶ 17    In 2012, plaintiffs Lessner and Reynolds's guardians filed this personal injury action. In 2015, plaintiffs filed their sixth amended complaint against the hospital, nurse Alling, the anesthesiologists, and Reynolds's treating physicians and their employers, seeking damages

- 4 -

for medical malpractice on behalf of Reynolds and damages for Lessner's claims of loss of consortium and loss of chance to marry.

¶ 18    Relevant to this appeal, plaintiffs alleged that Dr. Murino negligently delayed leaving the ER to treat Reynolds's tension pneumothorax and that EMS was liable for his negligence on the basis of *respondeat superior*. Also, plaintiffs alleged that EMS negligently violated its contractual obligations and the hospital's policy by instructing Dr. Murino not to leave the ER to treat hospital inpatients unless a code blue has been issued. Specifically, plaintiffs alleged that Dr. Murino was paged at 3:55 a.m. to come to the ICU to treat Reynolds's non-code blue tension pneumothorax, but Dr. Murino negligently failed to come immediately and delayed leaving the ER until the code blue was issued at 4:10 a.m. Plaintiffs alleged that EMS's instruction about not leaving the ER for non-code blue emergencies caused or contributed to Dr. Murino's failure to promptly treat Reynolds. Also, Lessner alleged that as a proximate result of defendants' negligence and Reynolds's injuries, she was deprived of his consortium and of the chance to marry.

¶ 19    Prior to trial, the court granted defendants' and the codefendants' motions to dismiss Lessner's claims for loss of consortium and loss of chance to marry, pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2014)). Also, plaintiffs settled their claims against the hospital and nurse Alling for $14 million.

¶ 20    Among the numerous pretrial motions filed in this matter, Dr. Murino and EMS moved *in limine* to bar any reference to medical malpractice insurance. They explained that their motion arose as a result of Dr. Murino's deposition testimony, which indicated that he thought his malpractice insurance with EMS did not cover treatment he rendered outside the ER to hospital inpatients in the absence of a code blue. Plaintiffs responded that Dr. Murino's credibility about his decision to leave the ER before the code blue was sounded was at issue, and his belief about his lack of malpractice coverage in such instances was very probative of that issue. Also, plaintiffs argued that a careful limiting instruction would prevent any prejudice to defendants from the mention of malpractice insurance.

¶ 21    The trial court granted Dr. Murino and EMS's motion *in limine*, finding that the concept of malpractice insurance inflames the jury and that the mention of malpractice insurance would have negative implications for the codefendants and was more prejudicial than probative. The trial court would allow plaintiffs to "get into" whether there was a policy and practice in place that Dr. Murino believed required him not to leave the ER unless a code blue was called.

¶ 22    Dr. Murino and EMS also filed motions *in limine* concerning plaintiffs' emergency medicine expert Dr. Daniel DeBehnke, who testified in his deposition that he could not say that Dr. Murino had breached the standard of care because there was no evidence to establish when Dr. Murino was told about Reynolds's tension pneumothorax. Defendants argued, *inter alia*, that plaintiffs should be barred at trial from disputing Dr. DeBehnke's deposition testimony and that he should be barred from testifying about matters not disclosed during discovery in accordance with Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007).

¶ 23    Relevant to this appeal, the trial court ruled that it would not prejudge the case but would see if plaintiffs could establish their case with evidence showing Dr. DeBehnke believed Dr. Murino "was called at X time and *** should have been at [Reynolds's] bedside at Y time." The court emphasized that "[t]here has to be support in the record for the expert's opinion" because the jury may not reach its decision based upon speculation. Based upon the record, the trial court was struggling to understand what Dr. DeBehnke "believe[d] Dr. Murino should

have done and when he should have done it other than using [the term] 'immediately' without any context [in the expert witness Rule 213 disclosure]." The trial court stated that the expert, not the jurors, must set forth the standard of care and the jurors would not be allowed to decide what "immediately" meant or how quickly they believed Dr. Murino should have gone to the ICU.

¶ 24    Opening statements in the jury trial commenced in May 2016. According to plaintiffs' theory of the case against Dr. Murino and EMS, regardless of whether the radiologist telephoned the ICU at either 3:50 a.m. or 3:57 a.m., the ICU would have quickly notified the ER about the tension pneumothorax, and the jury would have to decide if Dr. Murino could have treated Reynolds earlier but delayed leaving the ER in accordance with EMS's improper instructions not to leave the ER to treat inpatients unless a code blue was issued.

¶ 25    Plaintiffs' emergency medicine expert Dr. DeBehnke testified that he reviewed all the records and depositions in this case. In response to hypothetical questions based on assumed facts, Dr. DeBehnke stated that if Dr. Murino was informed at approximately 3:55 a.m. of Reynolds's tension pneumothorax but did not respond by going "immediately" to the ICU and instead delayed until 4:10 a.m. when the code blue was sounded, then Dr. Murino would have violated the standard of care. Also, if Dr. Murino was informed of Reynolds's tension pneumothorax at any time prior to 4:10 a.m. and did not leave the ER "immediately," then Dr. Murino would have violated the standard the care. However, Dr. DeBehnke acknowledged that he could not offer an opinion in the absence of facts about what time Dr. Murino was notified of the tension pneumothorax. Dr. DeBehnke admitted that he did not know when Dr. Murino was told about Reynolds's tension pneumothorax and could not find facts of a delay. Consequently, Dr. DeBehnke acknowledged that he could not express an opinion within a reasonable degree of medical certainty whether any delay by Dr. Murino occurred or whether he breached the standard of care.

¶ 26    Furthermore, Dr. DeBehnke opined that if Dr. Murino had performed the needle decompression on Reynolds before his cardiac arrest at 4:10 a.m., then it probably would have alleviated the pressure and prevented the cardiac arrest. Dr. DeBehnke also opined that EMS failed to use reasonable care when it instructed Dr. Murino not to leave the ER to treat inpatients unless a code blue was issued, and those instructions could have caused Dr. Murino to delay going to the ICU. Dr. DeBehnke believed that the telephone records were more reliable and accurate about when telephone calls were made and their duration than nurse Alling's time entry notations, including her note indicating that the ER was paged at 3:55 a.m.

¶ 27    After plaintiffs presented their case, defendants EMS and Dr. Murino moved for a directed verdict, arguing plaintiffs failed to show when Dr. Murino was notified of the tension pneumothorax and when he responded to that problem. Defendants asserted that the evidence established the ICU could not have telephoned the ER at 3:55 a.m. about the tension pneumothorax because the offsite radiologist did not telephone the ICU to report his findings until 3:57 a.m. Moreover, plaintiffs' expert Dr. DeBehnke had conceded that he could not accuse Dr. Murino of a delay because no one knew at what time he was notified about the tension pneumothorax and, thus, no one knew how much time elapsed between when he was notified of the problem and when he left the ER by 4:10 a.m., as the code blue page was being issued. Defendants argued that it would be complete speculation for the jury to decide when Dr. Murino was told about the tension pneumothorax and whether he delayed rendering treatment to Reynolds. This was because the workings of an ER after it receives a call for

assistance from an ICU was not a matter of common experience and plaintiffs failed to meet their burden of production to show who in the ICU called the ER and, especially, who in the ER received that call and what happened in the ER next.

¶ 28 Plaintiffs responded that there was circumstantial evidence indicating that when the radiologist apprised nurse Alling of Reynolds's problem, the ICU acted quickly to contact the ER to request assistance and someone in the ER would have quickly informed Dr. Murino but he failed to timely respond based on his employer's improper instruction not to respond unless a code blue was issued. Plaintiffs argued that it was the jury's role to decide which evidence about when Dr. Murino was informed of the problem was more credible. Plaintiffs argued that it was reasonable for jurors, based on their assessment of the common experience of the witnesses, to infer from the circumstantial evidence that the ICU nurses understood that Reynolds would die so they would have contacted the ER immediately and, in accordance with the hospital's triage system, someone in the ER would have informed Dr. Murino right away upon receiving such a call from the ICU.

¶ 29 The trial court took the motion for a directed verdict under advisement but observed that plaintiffs' case against Dr. Murino depended on whether he delayed leaving the ER within a tight time frame of no more than 13 minutes, as established by the time that elapsed between when the radiologist contacted the ICU and when Dr. Murino left the ER as the code blue was being sounded. Nurse Alling had testified that her time notations were estimates recorded several hours after the events, and the offsite radiology service's time-stamped electronic records and the telephone company's computer logs refuted Alling's time notations. Even accepting as true for purposes of the motion that Dr. Murino should have left the ER immediately when he was notified of the tension pnuemothorax and gone to the ICU, there was no evidence in the record to tell the jury when he was notified. Although plaintiffs speculated that the charge nurse probably telephoned the ER, the charge nurse was not called as a witness to testify regarding his custom and practice in this type of situation. Furthermore, there was no testimony about who in the ER would have received the ICU's telephone call or what the ER's custom and practice was upon receiving such a call.

¶ 30 On May 31, 2016, the trial court granted the motion for a directed verdict. On the next court date, the trial court elaborated that the case against Dr. Murino and EMS was all about response time and, even considering the evidence about the timeline in the light most favorable to plaintiffs, no more than 15 minutes elapsed between when the ICU allegedly called the ER and when Dr. Murino arrived in the ICU and treated Reynolds. However, during that short time frame, no evidence showed either who or at what time someone in the ER informed Dr. Murino of the tension pneumothorax or the custom and practice of the ER staff in that type of situation.

¶ 31 The jury trial proceeded against the codefendants, and the jury returned a verdict in the amount of $31,636,119 for Reynolds's medical malpractice damages. However, based on settlement agreements among the parties, Reynolds's recovery at the circuit court level was $16 million. In accordance with those settlement agreements, all the defendants except Dr. Murino and EMS were dismissed with prejudice.

¶ 32 After the trial, The Private Bank resigned from its role as guardian of Reynolds's estate. In December 2016, Lessner was appointed guardian of both Reynolds's person and estate. Plaintiffs filed a timely appeal.

## II. ANALYSIS

On appeal, plaintiffs argue that (1) the trial court erred in granting the directed verdict in favor of Dr. Murino and EMS because, viewing the evidence in the light most favorable to plaintiffs, the jury, based on reasonable inferences from the circumstantial evidence, could have concluded that Dr. Murino delayed leaving the ER and violated the standard of care; (2) the trial court abused its discretion by barring evidence about EMS's lack of medical malpractice insurance coverage if Dr. Murino left the ER to treat hospital inpatients for an emergency other than a code blue; and (3) this court should recognize Lessner's claims for loss of consortium and loss of a chance to marry.

### A. Illinois Supreme Court Rules 341 and 342

This court notes that plaintiffs have failed to comply with the provisions of Illinois Supreme Court Rules 341(h)(9) (eff. Jan. 1, 2016) and 342 (eff. Jan. 1, 2005). Specifically, plaintiffs failed to prepare a complete table of contents, with page references, of the record on appeal, which has made it difficult for this court to locate pleadings, orders, and transcripts in the record for purposes of reviewing plaintiffs' claims of error. The rules governing civil appeals are not merely suggestions, but are necessary for the proper and efficient administration of the courts. See *First National Bank of Marengo v. Loffelmacher*, 236 Ill. App. 3d 690, 691-92 (1992). This court is not required to sift through the record to find support for an issue, and ill-defined or insufficiently presented issues that do not satisfy the rules may be considered forfeited. See *Express Valet, Inc. v. City of Chicago*, 373 Ill. App. 3d 838, 855 (2007).

### B. Directed Verdict

Plaintiffs argue that the trial court erroneously granted a directed verdict in favor of Dr. Murino and EMS because plaintiffs "introduced more than sufficient [direct and circumstantial] evidence from which a reasonable jury could infer and conclude that Dr. Murino delayed leaving the ER and that his delay violated the standard of care."

Specifically, plaintiffs cite the evidence of (1) nurse Alling's time notations and testimony that the ICU worked as a team to quickly find a physician to treat Reynolds's emergency condition, (2) expert DeBehnke's testimony that Dr. Murino was required to leave the ER immediately to treat Reynolds, (3) the short distance between the ER and ICU, (4) the ER's triage system, and (5) EMS's instructions to Dr. Murino to respond to only code blue emergencies. Plaintiffs argue that there was "powerful circumstantial evidence from which the jury could have reasonably concluded that Dr. Murino was notified about [Reynolds's] condition immediately after the 3:55 a.m. page because the triage system was in place," was effective, and required that Dr. Murino be notified immediately about a dying patient. Plaintiffs complain that the trial court, instead of deferring to the jury, erroneously decided that there was no evidence about either when Dr. Murino was notified of the tension pneumothorax or the ER's custom and practice once it received a telephone call from the ICU.

We review *de novo* whether the trial court's judgment, granting Dr. Murino and EMS's motion for a directed verdict, was proper in light of the evidence admitted at trial. See *Fragogiannis v. Sisters of St. Francis Health Services, Inc.*, 2015 IL App (1st) 141788, ¶ 15. "[V]erdicts ought to be directed *** only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent [of the motion for a directed verdict], so

overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). "In ruling on a motion for a [directed verdict], a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Maple v. Gustafson*, 151 Ill. 2d 445, 453 & n.1 (1992) (noting "that motions for directed verdicts and motions for judgments *n.o.v.*, although made at different times, raise the same questions, and are governed by the same rules of law").

¶ 41 A directed verdict is improper where "there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Id.* at 454. "In reviewing the evidence, a trial court cannot ignore circumstantial evidence or reasonable inferences of negligence that can be drawn from circumstantial evidence." *Grewe v. West Washington County Unit District No. 10*, 303 Ill. App. 3d 299, 303 (1999). "[C]ircumstantial evidence is not limited to those instances in which the circumstances support only one logical conclusion; instead, circumstantial evidence will suffice whenever an inference may reasonably be drawn therefrom." *Id.*

¶ 42 Courts rightfully grant directed verdicts if the plaintiff in a civil case fails to meet the burden of production regarding each element of his claim, and proof that relies upon mere conjecture or speculation is insufficient. *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 354 (1992). "This 'burden of production' is met with regard to a given element of proof when there is some evidence which, when viewed most favorably to the plaintiff's position, would allow a reasonable trier of fact to conclude the element to be proven." *Id.* However, even if the plaintiff produces some evidence of a fact, a motion for a directed verdict may still be granted because some evidence of a fact that may seem substantial when viewed alone does not always retain such significance when viewed in the context of all of the evidence. *Pedrick*, 37 Ill. 2d at 504-05, 510 (a judgment *n.o.v.* was appropriate where the plaintiffs' testimony that the railroad crossing lights were not operating when a train struck their car was equivocal and ambiguous, but the railroad employees, who were corroborated by two disinterested witnesses, testified unequivocally that the lights were working). "As the light from a lighted candle in a dark room seems substantial but disappears when the lights are turned on, so may weak evidence fade when the proof is viewed as a whole." *Id.* at 504-05; see also *People v. Rosochacki*, 41 Ill. 2d 483, 490 (1969) (although courts are not to weigh the evidence, the *Pedrick* decision "fully contemplates that trial courts are to decide when weak evidence has so faded in the strong light of all of the proof that only one verdict is possible of rendition").

¶ 43 The necessary elements of plaintiffs' medical malpractice claim required them to prove (1) the applicable standard of care, (2) the health-care provider's negligent failure to comply with the applicable standard of care, and (3) a resulting injury proximately caused by the alleged negligence. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004). " 'Unless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard.' " *Id.* (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 242 (1986)). Furthermore, proximate cause "must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006).

¶ 44    Our review of the record establishes that the trial court correctly determined as a matter of law that plaintiffs failed to meet the burden of production regarding Dr. Murino's breach of the standard of care. The most that can be said about plaintiffs' evidence is that it would have been highly speculative for the jurors to infer therefrom that Dr. Murino negligently delayed leaving the ER to treat Reynolds until the code blue was issued at 4:10 a.m. While there is no rule against basing one inference upon another inference, the chain of inferences must not become so tenuous that the final inference has no probative value. *Leavitt v. Farwell Tower Ltd. Partnership*, 252 Ill. App. 3d 260, 268 (1993). The jury could not reasonably infer that a delay that breached the standard of care occurred because it would have been mere speculation for the jury to infer that (1) based on the ICU staff's understanding of the implications of a tension pneumothorax finding, at about 3:57 a.m., someone in the ICU immediately contacted someone in the ER and (2) based on the ER's triage system, someone in the ER immediately informed Dr. Murino about the tension pneumothorax.

¶ 45    Nurse Alling testified that her notes were not intended to record specific and accurate times about Reynolds's treatment and were written several hours after the events occurred. The time notations within her notes—which indicated that at 3:50 a.m. she learned about the tension pneumothorax and that at 3:55 a.m., in addition to re-paging the pulmonologist and calling the attending physician, the "ER Dr. [was] paged also"—were her best guesses or rough estimates. This evidence must be viewed in the context of all the evidence. Specifically, the computer-automated time stamps on the electronic records and logs of the offsite radiology service and the telephone company, which entities had no apparent interest in the outcome of this lawsuit, indicated that the offsite radiologist did not begin reading Reynolds's X-ray until 3:55 a.m. and did not telephone the ICU to report his findings until 3:57 a.m. Moreover, plaintiffs' expert Dr. DeBehnke conceded that the computer-automated time stamps were more likely accurate than Alling's time notations.

¶ 46    We cannot and need not resolve the conflict as to the timeline evidence. Rather, in the context of our directed verdict analysis, we decide only if the significance of the "some evidence" of a fact produced by plaintiffs fades when the proof is viewed as a whole. See *Pedrick*, 37 Ill. 2d at 504-05; *Rosochacki*, 41 Ill. 2d at 490.

¶ 47    Nurse Alling did not testify that upon learning of the tension pneumothorax finding, someone in the ICU would have immediately telephoned the ER for assistance. Instead, Alling testified that she notified the ICU charge nurse about the finding. While Alling attempted to contact the "on call" doctor from the attending physician's group to try to get a consult for a trauma surgeon to come in, the charge nurse probably called the house supervisor because the ICU's objective was to "reach out" to find a physician who could get to the ICU the fastest and the house supervisor had the information about who was available in the hospital. In addition, plaintiffs did not call the ICU charge nurse on duty to testify about the events on the date at issue or the ICU's custom and practice in this type of situation. Because what happens in an ICU under the circumstances present here was not a matter within the common experience of the jurors, it was not reasonable based on the evidence presented at trial to infer that someone in the ICU sought assistance at about 3:57 a.m. by immediately telephoning the ER first.

¶ 48    We also reject plaintiffs' assertion that the ER's triage system constituted "powerful circumstantial evidence" from which the jury reasonably could have inferred that Dr. Murino was notified about the ICU's tension pneumothorax patient as soon as someone in the ER received the ICU's telephone call. According to plaintiffs, the jury reasonably could have

inferred that the triage system, which required that Dr. Murino should be notified immediately about a dying patient, had worked effectively at the time in question but Dr. Murino hesitated to leave the ER, based on EMS's instruction not to leave the ER for non-code blue emergencies.

¶ 49        Circumstantial evidence "is the *proof of certain facts and circumstances* from which the jury may infer *other connected facts* which usually and reasonably follow according to the *common experience of mankind*." (Emphases added.) *Pace v. McClow*, 119 Ill. App. 3d 419, 423-24 (1983). What happens in an ER when it receives a telephone call from the ICU for assistance is not a matter within the common experience of mankind, and we find no circumstantial evidence sufficient to support the inference plaintiffs urge on appeal.

¶ 50        Plaintiffs did not call any witnesses from the ER to testify about their custom and practice when they receive a call from the ICU for assistance. However, Dr. Murino testified that the ER nurses initially classified patients under the ER's triage system, which was a fluid and ongoing process. A telephone call from the ICU to the ER could be answered by anyone, including administrative staff; it depended on who was around. The call could bounce around if everyone in the ER was busy in a room assisting someone, starting an IV, etc. However, someone should be made aware of the call, and then Dr. Murino "hopefully" would be made aware of it as soon as possible.

¶ 51        Dr. Murino also testified that even though his ER patients at the time were not suffering from a condition equal to or more serious than Reynolds's condition, Dr. Murino still had to discuss the ER patients' treatment plans with the ER nurses and observe any high risk ER patients before he could leave the ER to treat Reynolds. Dr. Murino testified that he was moving as fast as he could, was leaving the ER as the code blue page was heard on the public address system at 4:10 a.m., and had begun treating Reynolds by 4:12 a.m. Contrary to plaintiffs' argument on appeal, it was not reasonable, based on the evidence presented at trial, to infer that Dr. Murino was notified about the tension pnuemothorax as soon as the ER received the ICU's call and sufficiently in advance of 4:10 a.m. to have made it to Reynolds's bedside in time to prevent his cardiac arrest.

¶ 52        Furthermore, the testimony of plaintiffs' expert, Dr. DeBehnke, does not support plaintiffs' negligence claims. Although Dr. DeBehnke testified that Dr. Murino was required to leave the ER "immediately" upon being told of Reynolds's condition, Dr. DeBehnke admitted that he could not find any facts of a delay. Because Dr. DeBehnke did not know when Dr. Murino was told of Reynolds's condition and, thus, did not know how long it took for Dr. Murino to respond to that information, Dr. DeBehnke could not opine to a reasonable degree of medical certainty whether Dr. Murino was guilty of delay and whether he breached the standard of care.

¶ 53        We also reject plaintiffs' assertion that they presented ample evidence to support the assumptions in the hypothetical questions posed to Dr. DeBehnke and that his answers to those hypothetical questions constituted sufficient evidence for the jury to have found that Dr. Murino was negligent.

>           "Counsel has a right to ask an expert witness a hypothetical question that assumes facts that counsel perceives to be shown by the evidence. [Citation.] The assumptions contained in the hypothetical question must be based on direct or circumstantial evidence, or reasonable inferences therefrom. [Citation]. The hypothetical question *** should state facts that the interrogating party claims have been proved and for which there is support in the evidence. ***

It is within the sound discretion of the trial court to allow a hypothetical question, although the supporting evidence has not already been adduced, if the interrogating counsel gives assurance it will be produced and connected later. Evidence admitted upon an assurance that it will later be connected up should be excluded upon failure to establish the connection. [Citations.]" *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 96 (1995).

¶ 54 As discussed above, plaintiffs failed to present direct or circumstantial evidence from which the jury could properly infer who or at what time someone in the ICU informed the ER about the tension pneumothorax, and who or at what time someone in the ER conveyed that information to Dr. Murino. Accordingly, in the absence of evidence to support the factual assumptions in the hypothetical questions posed to Dr. DeBehnke, his testimony was not probative of any alleged delay by Dr. Murino or breach of the standard of care. Plaintiffs were required to present expert medical evidence as to the breach of care (*Purtill*, 111 Ill. 2d at 242), and failed to do so. Under these circumstances, the jury could not have decided whether Dr. Murino was guilty of a delay without engaging in pure speculation.

¶ 55 Finally, plaintiffs argue that the directed verdict was improper because the evidence and reasonable inferences drawn therefrom showed a substantial factual dispute regarding the timeline of the events and the jury's determination regarding the conflicting evidence and assessment of the credibility of Dr. Murino's claim that he did not delay leaving the ER would have been decisive to the outcome. We do not agree. Regardless of whether the offsite radiologist telephoned the ICU at 3:50 a.m. or 3:57 a.m., in the absence of the necessary facts about when the ICU actually contacted the ER and when Dr. Murino was actually informed of the tension pneumothorax, the jury could only engage in pure speculation about whether a delay occurred. Because the jury lacked the necessary facts to determine whether there was a delay, the factual dispute about the time of the radiologist's telephone call cannot be said to be substantial and a purely speculative credibility assessment of Dr. Murino's claim of no delay cannot be considered decisive to the outcome.

¶ 56 Because plaintiffs failed to meet the burden of production to show that Dr. Murino breached the standard of care, plaintiffs' claims against EMS based on Dr. Murino's alleged breach similarly fail.

¶ 57 All of the evidence, viewed most favorably to plaintiffs, so overwhelmingly favors EMS and Dr. Murino that no contrary verdict based on this evidence could ever stand. The trial court properly granted their motion for a directed verdict at the close of plaintiffs' presentation of evidence.

¶ 58                    C. Precluding Medical Malpractice Insurance Evidence

¶ 59 Plaintiffs argue that the trial court committed reversible error by precluding testimony that EMS told Dr. Murino they would not be covered by their medical malpractice insurance if he left the ER to treat a hospital inpatient for a non-code blue emergency. According to plaintiffs, because Dr. Murino testified that he did not delay leaving the ER to treat the tension pneumothorax, even though a code blue had not been issued yet, the precluded evidence would have challenged his credibility by showing he had a powerful incentive not to leave the ER prior to the issuance of the code blue. Plaintiffs argue that the precluded evidence was "centrally relevant to the jury's determination of Dr. Murino's credibility, and it was error for the trial court to deprive the jury of this evidence." Also, plaintiffs contend that limiting

- 12 -

instructions to the jury about the proper use of this evidence would have prevented any prejudice to defendants.

¶ 60    A trial court's ruling on a motion *in limine*, which determines whether certain evidence may be referred to or offered at trial, will not be disturbed on review, absent a clear abuse of discretion. *Swick v. Liautaud*, 169 Ill. 2d 504, 521 (1996). A trial court abuses its discretion only if it acts arbitrarily without the employment of conscientious judgment, exceeds the bounds of reason and ignores recognized principles of law, or adopts a position that no reasonable person would take. *Schmitz v. Binette*, 368 Ill. App. 3d 447, 452 (2006). Moreover, an "error in the exclusion or admission of evidence does not require reversal unless one party has been prejudiced or the result of the trial has been materially affected." (Internal quotation marks omitted.) *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 36 (2010).

¶ 61    "Reference to the fact that defendant is protected by insurance or some other indemnity agreement ordinarily is improper and constitutes reversible error." *Golden v. Kishwaukee Community Health Services Center, Inc.*, 269 Ill. App. 3d 37, 44 (1994). The rationale underlying this rule is that such information is not only irrelevant to the determination of negligence but also artificially inflates any verdict. *Imparato v. Rooney*, 95 Ill. App. 3d 11, 15 (1981). Exceptions to this general rule "allow introduction of the fact of insurance where it bears materially upon the credibility of a witness or an impeaching statement." *Golden*, 269 Ill. App. 3d at 44; see also *Boettcher v. Fournie Farms, Inc.*, 243 Ill. App. 3d 940, 945 (1993) (while the existence of insurance is not admissible to show fault, it may be shown in connection with issues such as agency, ownership, control, bias, or prejudice of a witness). However, even relevant evidence may be excluded if its probative value is substantially outweighed by its prejudicial impact or potential to confuse or mislead the jury. *Gill v. Foster*, 157 Ill. 2d 304, 313 (1993).

¶ 62    Plaintiffs contend that the evidence about EMS's lack of malpractice insurance coverage for non-code blue emergencies was relevant to impeach Dr. Murino's credibility regarding when he left the ER. However, even assuming the relevance of the precluded evidence, plaintiffs failed, as discussed above, to show when Dr. Murino was informed about the tension pneumothorax. Thus, the issue of his credibility about when he left the ER was not materially significant because the jury lacked the necessary facts to enable them to measure the duration of any alleged delay. Moreover, the trial court did not prevent plaintiffs from challenging Dr. Murino's credibility with evidence that he understood it was EMS's policy that he should not leave the ER to treat a hospital inpatient unless a code blue had been called. The trial court believed that the mention of medical malpractice insurance in this case would inflame the jury and weighed the probative value of the insurance evidence against the potential prejudice to Dr. Murino, EMS, and the seven codefendants.

¶ 63    We conclude that the trial court appropriately used its discretion and crafted a ruling that addressed plaintiffs' concerns to present probative evidence about Dr. Murino's incentive to delay leaving the ER, while protecting defendants and codefendants from the danger that the jury would misuse the insurance evidence against them.

¶ 64                    D. Loss of Consortium and Loss of a Chance to Marry

¶ 65    Finally, plaintiffs argue that this court should recognize Lessner's claims for loss of consortium and loss of chance to marry because she and Reynolds were in a long-term committed relationship for many years and their scheduled wedding was less than 20 days

away when defendants' alleged negligence prevented Lessner and Reynolds from marrying. Lessner acknowledges that her claims are not recognized under current Illinois law but she seeks in good faith a change in the law based on the unique circumstances of this case, *i.e.*, her and Reynolds's long-standing domestic partner relationship and commitment and imminent plan to marry and have children.

¶ 66    We review *de novo* the trial court's dismissal, pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2014)), of Lessner's claims for loss of consortium and loss of chance to marry. *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 19. Motions to dismiss under section 2-615 of the Code challenge the legal sufficiency of a pleading based on defects apparent on its face. *Id.* In ruling on a section 2-615 motion, a court must accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts. *Id.* The court determines whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted. *Id.*

¶ 67    Clear Illinois precedent has established that common-law marriages are invalid in Illinois, and this prohibition is statutory in nature. 750 ILCS 5/214 (West 2014); *Hewitt v. Hewitt*, 77 Ill. 2d 49 (1979); *Blumenthal*, 2016 IL 118781, ¶ 52. "[T]he statutory provision abolishing common-law marriage *** embodied the public policy of Illinois that individuals acting privately by themselves, without the involvement of the State, cannot create marriage-like benefits." *Blumenthal*, 2016 IL 118781, ¶ 61. See also *Hewitt*, 77 Ill. 2d at 61 (the recognition of mutual property rights between unmarried cohabitants would violate the policy of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/1-1 *et seq.* (West 2014), which has an underlying purpose " 'to strengthen and preserve the integrity of marriage and safeguard family relationships' " (quoting Ill. Rev. Stat. 1977, ch. 40, ¶ 102)).

¶ 68    We are bound by our supreme court's decisions and have a duty to follow them in similar cases. *Price v. Phillip Morris, Inc.*, 2015 IL 117687, ¶ 38. Furthermore, this court has rejected loss of consortium claims by members of an unmarried couple. See *Gillenwater v. Honeywell International Inc.*, 2013 IL App (4th) 120929; *Monroe v. Trinity Hospital-Advocate*, 345 Ill. App. 3d 896 (2004); *Medley v. Strong*, 200 Ill. App. 3d 488 (1990); *Sostock v. Reiss*, 92 Ill. App. 3d 200 (1980). Accordingly, we reject plaintiffs' request for a good faith extension of such a claim to the facts here.

¶ 69    Also, plaintiffs cite no relevant precedent indicating that Illinois courts recognize a cause of action for the loss of a chance to marry, and we decline plaintiffs' invitation to recognize such a cause of action on the facts here. Lessner and Reynolds lived together for 16 years, and they were never barred by any state or federal law from marrying each other. They did not seek the protections and privileges that flow from the legally recognized union of marriage for over a decade. That delay was their choice.

¶ 70    Plaintiffs argue that Illinois law has not evolved "to catch up with [the] fundamental changes in the everyday lives of citizens" and the changing "historical milieu" concerning long-term committed but unmarried relationships. However, the concerns that led to the statutory prohibition against recognizing common-law marriages are long-standing and diverse. This court is not tasked with evaluating and setting public policy (*Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶ 79); that job is reserved for our duly elected legislature, which possesses the necessary investigative and fact-finding abilities. *Hewitt*, 77 Ill. 2d at 61; *Blumenthal*, 2016 IL 118781, ¶ 77.

¶ 71    We conclude that the trial court properly granted defendants' motion to dismiss Lessner's claims for loss of consortium and loss of chance to marry, pursuant to section 2-615 of the Code.

¶ 72                                    III. CONCLUSION

¶ 73    The trial court did not err in granting the directed verdict because the evidence, even viewed in the light most favorable to plaintiffs, overwhelmingly favored EMS and Dr. Murino so that no jury could find for plaintiffs. Also, the trial court's decision to preclude evidence about medical malpractice insurance was not an abuse of discretion. Finally, we cannot recognize plaintiff Lessner's claims for loss of consortium and loss of a chance to marry.

¶ 74    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 75    Affirmed.