# Illinois Official Reports

## Appellate Court

---

*Wheeler Financial, Inc. v. Law Bulletin Publishing Co.*,
**2018 IL App (1st) 171495**

---

| | |
|---|---|
| Appellate Court Caption | WHEELER FINANCIAL, INC., Plaintiff-Appellant, v. LAW BULLETIN PUBLISHING COMPANY, Defendant-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-17-1495 |
| Filed | September 14, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-9581; the Hon. Margaret A. Brennan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Greenberg Traurig, LLP, of Chicago (Gregory E. Ostfeld, Paul J. Ferak, and Ian D. Burkow, of counsel), for appellant.<br><br>Howard & Howard Attorneys PLLC, of Chicago (Scott C. Frost and Daniel S. Rubin, of counsel), and Howard & Howard Attorneys PLLC, of Royal Oak, Michigan (Michael O. Fawaz, of counsel), for appellee. |

Panel

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Justices Hall and Lampkin concurred in the judgment and opinion.[*]

**OPINION**

¶ 1     Plaintiff, Wheeler Financial, Inc. (Wheeler), filed a breach of contract action against defendant, Law Bulletin Publishing Company (Law Bulletin), arising out of Law Bulletin's error in publishing a notice containing the wrong hearing date for Wheeler's application for a tax deed to certain property at 1656 N. Winchester Avenue (the Winchester property). Wheeler alleged that Law Bulletin's error caused the circuit court to deny its tax deed application in a separate proceeding. A jury returned a verdict in favor of Law Bulletin, finding that Wheeler had failed to perform all of its obligations under the contract. On appeal, Wheeler argues that (1) the trial court erred in denying its pretrial motion for partial summary judgment and its motion at trial for a directed verdict, (2) the trial court erred in admitting evidence of the parties' prior course of dealing and instructing the jury thereon, and (3) the trial court erred in denying certain *in limine* motions. We affirm.

¶ 2                                    I. Background
¶ 3                                A. The Tax Sale Process
¶ 4     Every year, the Cook County Treasurer's Office (Treasurer's Office) conducts an auction of tax liens on properties with delinquent tax bills (tax sale). After purchasing a tax lien, the tax buyer pays the Treasurer's Office the delinquent taxes owed by the property owner.

¶ 5     Pursuant to the Property Tax Code (35 ILCS 200/21-190 *et seq.* (West 2016)), the property owner whose tax lien has been sold at the tax sale can satisfy the lien at any time within the redemption period by paying the delinquent taxes due, plus certain costs and penalties.

¶ 6     If the property owner fails to satisfy the tax lien by paying the amounts due within the applicable redemption period, then the tax buyer may apply to the circuit court for a tax deed for the property. When a tax deed for the property is acquired and recorded, the tax buyer obtains fee simple title to the property.

¶ 7     To acquire a tax deed, the tax buyer must show the court that he gave written notice (Take Notice) to the property owner that his delinquent property taxes have been sold at the tax sale and that he must pay the delinquent taxes before the expiration of the redemption period in order to preserve his property rights. See *id.* § 22-10. The Take Notice must be "published in a newspaper as set forth in Section 22-20." *Id.* § 22-15. Section 22-20 of the Property Tax Code requires that the published Take Notice "shall contain (a) notice of the filing of the petition for tax deed, (b) the date on which the petitioner intends to make application for an order on the petition that a tax deed issue, (c) a description of the property, (d) the date upon which the property was sold, (e) the taxes or special assessments for which it was sold and (f) the date on which the period of redemption will expire." *Id.* § 22-20.

---

[*]Justice Hall has listened to a recording of oral arguments, which were heard on August 7, 2018.

¶ 8                                    B. The Complaint

¶ 9        On September 12, 2014, Wheeler filed a two-count complaint for breach of contract and breach of implied contract against Law Bulletin. Wheeler alleged that it is a Chicago-based company that purchases tax liens at county sales and acquires properties associated with those liens. For more than 15 years, Wheeler has exclusively used Law Bulletin to publish Take Notices for the tax liens it has purchased at tax sales. Between 2012 and 2014 alone, Wheeler paid Law Bulletin "hundreds of thousands of dollars in publication costs for Take Notices that the Law Bulletin published in the Chicago Daily Law Bulletin."

¶ 10       In each case, Wheeler submitted a publication request for its Take Notices by e-mailing a text file to Law Bulletin that included the text for each of the Take Notices that Wheeler wanted to publish. Law Bulletin published the text of the Take Notices provided to it by Wheeler in exchange for a fee. Law Bulletin "knew that the Take Notices it received from Wheeler had to be published accurately based on the information Wheeler provided and that if the publication were inaccurate, Wheeler would be unable to acquire the tax deed associated with that property."

¶ 11       In May 2013, Wheeler advised Law Bulletin that it wanted to publish Take Notices for over 350 different tax liens Wheeler had acquired during the September 2010 tax sale. On May 29, 2013, Wheeler e-mailed Law Bulletin the text file for the Take Notices, including the Take Notice related to the Winchester property, which stated:

> "This notice is also to advise you that a petition has been filed for a tax deed which will transfer title and the right to possession of this property if redemption is not made on or before 9/13/2013.
>
> This matter is set for hearing in the Circuit Court of this county, in the Richard J. Daley Center, 50 W. Washington Street, Courtroom 1704, Chicago, Illinois on 10/11/2013 at 9:30 a.m."

¶ 12       Law Bulletin accepted Wheeler's Take Notices for publication and charged Wheeler the requisite fee. However, the Take Notice for the Winchester property published in the Chicago Daily Law Bulletin incorrectly stated that the matter was set for hearing on "10/07/2013."

¶ 13       The owner of the Winchester property did not redeem the tax lien for the property within the redemption period, and Wheeler subsequently filed an application for the tax deed with the circuit court.

¶ 14       On January 22, 2014, the circuit court denied Wheeler's application for a tax deed for the Winchester property "solely due to the defective Law Bulletin publication" of the wrong hearing date.

¶ 15       In count I for breach of contract, Wheeler alleged that it had "an enforceable oral contract" with Law Bulletin, whereby Wheeler agreed to send Law Bulletin the Take Notice for the Winchester property, and Law Bulletin agreed to publish it as written by Wheeler in exchange for a fee. Law Bulletin breached the oral contract by publishing the Take Notice with an incorrect hearing date that caused the circuit court to deny Wheeler's application for a tax deed. Wheeler sought damages in excess of $1 million, the estimated value of the Winchester property.

¶ 16       In count II for breach of an implied contract, Wheeler alleged that it had an enforceable implied contract with Law Bulletin, whereby Wheeler agreed to send Law Bulletin the Take Notice for the Winchester property, and Law Bulletin agreed to publish it as written by

Wheeler in exchange for a fee. Law Bulletin breached the implied contract by publishing the Take Notice with the wrong hearing date.

¶ 17 Law Bulletin's defense was that there was a 15-year course of dealing between the parties that qualified the terms of the contract, pursuant to which the first publication of all Take Notices was provided to Midwest Real Estate Investment Company (Midwest) to review on Wheeler's behalf and Midwest/Wheeler was required to notify Law Bulletin of any errors so that they could be corrected in a republication within the notice-serving deadline. Law Bulletin contended that Wheeler failed to abide by the terms of the contract when it failed to have Midwest review the first publication of the Take Notice for the Winchester property and did not notify Law Bulletin of the error in the hearing date in time for it to republish a corrected version.

¶ 18                                        II. Trial

¶ 19                                    A. Timothy Gray

¶ 20 Timothy Gray (Mr. Gray) testified that he is Wheeler's president. Wheeler was formed in 1996, and its main purpose is to purchase tax liens at Cook County tax sales. Midwest provided legal services to Wheeler that facilitated its purchase of the tax liens, in particular, Midwest provided Law Bulletin with the Take Notices for publication. Midwest shared office space with Wheeler and was run by Mr. Gray's father and brother, David Gray Sr. (Mr. Gray Sr.) and David Gray Jr. (Mr. Gray Jr.), respectively.

¶ 21 Wheeler (through its intermediary, Midwest) sent Take Notices to Law Bulletin for publication in the Chicago Daily Law Bulletin two to four times per year for 15 years, and each batch of publications would include 250 to 400 notices. In other words, Wheeler published 1000 to 1600 Take Notices per year with Law Bulletin, over a period of about 15 years. During the time that Wheeler was publishing its Take Notices with Law Bulletin, Mr. Gray was never informed by Law Bulletin that Wheeler needed to review the publication for accuracy or that it was responsible for any errors that Law Bulletin made during publication of the Take Notices. Mr. Gray did not have any understanding that Law Bulletin would drop off a copy of the paper after the first publication of the Take Notices so that Wheeler/Midwest could review it.

¶ 22 Wheeler paid Law Bulletin about $72,000 to publish 315 Take Notices on June 5, 6, and 7, 2013. Mike Phalen, a representative of Midwest, sent Ben Desnoyers, an employee of Law Bulletin, an e-mail with a text file of the Take Notices, including the Take Notice for the Winchester property, which stated that the matter was set for hearing in the circuit court on October 11, 2013. Mr. Gray was not aware of anyone from Wheeler or Midwest subsequently contacting Law Bulletin to amend the Take Notice to reflect a change in the hearing date. However, when Law Bulletin published the Take Notice for the Winchester property on June 5, 6, and 7, it contained the wrong hearing date.

¶ 23 During his direct examination, Mr. Gray was shown the masthead of the Chicago Daily Law Bulletin, which he described as an "introductory paragraph" located on the inside of the publication. The masthead, which was published to the jury, stated that Law Bulletin was not responsible for errors in advertisements after the first publication if not advised of the error by the advertiser. Prior to this litigation, Mr. Gray was unaware of the existence of the masthead and was never informed by Law Bulletin that it applied to Take Notices.

## B. David Gray Jr.

Mr. Gray Jr. testified that he became President and general counsel for Midwest in 2010, after his father's death. Prior to 2013, Frank Dufkis was the Midwest employee who sent the Take Notices on behalf of Wheeler to Law Bulletin for publication. In February 2013, Mr. Dufkis left Midwest, and Mr. Gray Jr. took on his work responsibilities.

On May 14, 2013, Mr. Gray Jr. sent an e-mail to Mr. Desnoyers, who was Law Bulletin's "point of contact" with regard to Take Notices. The e-mail stated:

> "Frank Dufkis has left our office, and I'm preparing to publish Take Notices for petitions for tax deeds. Would you kindly let me know the information you need, the form you need it in and any other matters we need to know to process these publications."

About an hour later, Mr. Desnoyers responded with an e-mail, stating: "Frank used to email me a text file with all the notices and delivered a check. We enter them in our system and send you the receipts. I attached an old file that he sent last year if that helps."

Mr. Gray Jr. had his employee, Mr. Phalen, e-mail Mr. Desnoyers a text file with the Take Notices (including the Take Notice for the Winchester property) on May 29, 2013. The May 29 e-mail stated: "Let me know if you need anything else from me."

No one from Law Bulletin asked Midwest or Wheeler to do anything further with respect to the publication of the Take Notices.

The Take Notice for the Winchester property e-mailed to Mr. Desnoyers provided for an October 11, 2013, hearing date. Mr. Gray Jr. specifically checked the text file for accuracy before it was sent to Law Bulletin. However, the Take Notice published in the Chicago Daily Law Bulletin on June 5, 6, and 7 incorrectly provided for an October 7, 2013, hearing date.

Mr. Gray Jr. did not check the June 5, 6, and 7 Chicago Daily Law Bulletins to ensure that the Take Notices had been published accurately because he did not think that it was his job to do so. No one from Law Bulletin dropped off copies of the Chicago Daily Law Bulletins to his office or told him that he was required to review the published Take Notices for errors. Also, no one from Law Bulletin told him that the masthead, which provides that advertisers must advise Law Bulletin of errors in the advertisement, applies to Take Notices.

A hearing was subsequently held on Wheeler's application for a tax deed for the Winchester property on January 22, 2014. The circuit court denied the application due to the error in Law Bulletin's publication of the Take Notice with the wrong hearing date.

## C. Frank Dufkis

Mr. Dufkis testified that, as a staff attorney at Midwest for about 18 years, he supervised several paralegals. One of the jobs of the paralegals was to review the published Take Notices for accuracy.

## D. The Midwest Policy Handbook

In reviewing the published Take Notices for accuracy, the paralegals were complying with the Midwest Policy Handbook (Handbook). The Handbook was promulgated by Mr. Gray Sr. in 2002. In pertinent part, it set forth in writing Midwest's policy of reviewing the first publication of Take Notices for accuracy and reporting any errors. Specifically, the Handbook stated:

"Upon receipt of the tear sheets or on the first day of publication, whichever is first to occur, the Clerk shall verify the accuracy of the Published Notices as to all dates shown on the notice including date of sale, tax year sold, redemption date and court date and the spelling of all names. Any inaccuracy must be promptly brought to the attention of a staff attorney."

¶ 36 Mr. Gray Jr. testified that, after he became president of Midwest in 2010, he did not use the Handbook, and he "never had any of the employees there use it." However, Mr. Gray Jr. admitted that he was not aware of any writing that formally rescinded the Handbook's policy of reviewing the first publication of the Take Notices and reporting any errors.

¶ 37            E. Michael Phalen

¶ 38 Mr. Phalen testified he worked at Midwest for about 10 years. In April 2013, Mr. Gray Jr. asked him for help in publishing Take Notices in the Chicago Daily Law Bulletin because Mr. Dufkis, who formerly handled the publication of the Take Notices, had left Midwest. On April 23, 2013, Mr. Phalen sent Mr. Desnoyers an e-mail, asking about the steps that needed to be taken to ensure publication of the Take Notices. Mr. Desnoyers responded that Mr. Phalen could either e-mail him the Take Notices or submit them through the Law Bulletin website.

¶ 39 Mr. Phalen then created a text file with over 300 Take Notices, including the Take Notice for the Winchester property, printed them out, and showed them to Mr. Gray Jr., who reviewed and approved of them.

¶ 40 On May 29, 2013, Mr. Phalen e-mailed the Take Notices to Mr. Desnoyers and asked if anything else was needed for publication. Mr. Desnoyers did not respond that anything else was needed.

¶ 41 On cross-examination, Mr. Phalen admitted that he never specifically asked Mr. Desnoyers if he needed to review the published Take Notices for accuracy.

¶ 42            F. Ben Desnoyers

¶ 43 Mr. Desnoyers testified he worked for Law Bulletin from March 2000 to February 2014. In 2005, he became the manager of Law Bulletin's Public Notice Network, an online portal whereby law firms electronically submitted Take Notices for publication in the Chicago Daily Law Bulletin.

¶ 44 Mr. Desnoyers supervised several employees who helped process the Take Notices. Mr. Desnoyers explained that when Take Notices were e-mailed to them for publication, the employees would copy and paste them into the "publishing system," "assign the run dates," and "hit publish."

¶ 45 Mr. Desnoyers was familiar with Wheeler because Law Bulletin had been publishing their Take Notices for many years. Mr. Dufkis, an employee of Midwest, would e-mail Mr. Desnoyers the Take Notices on behalf of Wheeler. After the Take Notices were copied and pasted into the system, and then published, Mr. Desnoyers would hand deliver a copy of the Chicago Daily Law Bulletin to the Midwest offices on the day of the first run so that they could review the Take Notices on behalf of Wheeler. Mr. Desnoyers testified:

"Q. And who requested that that occur?

A. Wheeler or Dave [Gray Jr.] or Frank [Dufkis]. Frank Dufkis requested that I send it over so they could check it and verify. *** So he could look at his notices to make sure that they were right.

***

Q. And then after that, could you describe what would typically occur, if anything, between you and Mr. Dufkis?

A. He would go through the newspaper. And if he saw something that he didn't like, if it was spacing or if there were dates or changes, he would call or e-mail me to make changes. And then we would republish them before the deadline."

¶ 46   Mr. Desnoyers did not charge Wheeler for the republication costs. No other customers requested that a copy of the Chicago Daily Law Bulletin be delivered to them after the first run so that the Take Notices could be reviewed for errors.

¶ 47   On cross-examination, Mr. Desnoyers testified that when Mr. Gray Jr. sought help in publishing the Take Notices after the resignation of Mr. Dufkis, he told Mr. Gray Jr. to send a text file, deliver a check, and "to look over the paper [and] check it over and let me know if there's any errors."

¶ 48   Mr. Desnoyers further testified that, after the Take Notices (including the Take Notice for the Winchester property) were published on June 5, 2013, he walked over to the Midwest office on that day and handed a copy of the Chicago Daily Law Bulletin to Mr. Gray Jr. and specifically told him to review the Take Notices for accuracy.

¶ 49   Mr. Gray Jr. did not inform him of the incorrect hearing date in the published Take Notice for the Winchester property until November 2013.

¶ 50                                   G. Myles Ahearn

¶ 51   Mr. Ahearn testified that he succeeded Mr. Desnoyers as manager of the Public Notice Network in 2014. Mr. Ahearn made a "guess" that "some bad copying and pasting" resulted in the wrong hearing date being published in the Take Notice for the Winchester property.

¶ 52   Despite the error, Wheeler continued to publish Take Notices in the Chicago Daily Law Bulletin in 2014. On April 8, 2014, Mr. Ahearn e-mailed Mr. Gray Jr. and told him he would be dropping off a copy of the Chicago Daily Law Bulletin so that Mr. Gray Jr., could review the latest published Take Notices and "make any necessary corrections as soon as possible." Mr. Ahearn also stated that Law Bulletin was "instituting a new policy" regarding cutting and pasting Take Notices and that he would be willing to stop by Mr. Gray Jr.'s office to explain how to submit the notices. Mr. Gray Jr. e-mailed a response on April 8, stating:

"I will have another group to publish in a few months and we can meet for training on the new system, which sounds like a great new procedure. For now I assume you will do them as we have in the past and I, or my team, will proof read the actual paper when it is ran."

¶ 53                                   H. Jury Instructions

¶ 54   During the jury instruction conference, Law Bulletin requested a non-Illinois Pattern Jury Instruction (non-IPI instruction) on course of dealing. Wheeler objected on the grounds that Law Bulletin's proposed instruction was an inaccurate reflection of the law. Wheeler offered

its own proposed, non-IPI course of dealing instruction. The trial court gave Law Bulletin's instruction, which stated:

> "A previous course of dealing may give meaning to or qualify an agreement. Where the terms of a contract are doubtful or uncertain and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction may be considered by you."

¶ 55    We will discuss Law Bulletin's instruction, which was given to the jury, and Wheeler's proposed instruction, which was not given, in greater detail later in this opinion.

¶ 56                                III. The Jury Verdict

¶ 57    The jury answered four questions posed in the verdict form. The first question asked: "Did Wheeler prove there was an offer?" The jury answered, yes.

¶ 58    The second question asked: "Did Wheeler prove there was an acceptance?" The jury answered, yes.

¶ 59    The third question asked: "Did Wheeler prove there was consideration?" The jury answered, yes.

¶ 60    The fourth question asked: "Did Wheeler prove it performed its obligations under the contract?" The jury answered, no.

¶ 61    The jury entered a verdict in favor of Law Bulletin and against Wheeler.

¶ 62    Wheeler appeals.

¶ 63                                    IV. Analysis
¶ 64              A. The Trial Court's Denial of Wheeler's Summary Judgment Motion

¶ 65    First, Wheeler contends that the trial court erred in denying its pretrial motion for partial summary judgment on the issue of Law Bulletin's liability. Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016).

¶ 66    Generally, when a case proceeds to trial after the denial of a summary judgment motion, the order denying the motion for summary judgment merges with the judgment entered and is not appealable. *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 42. The merger doctrine applies in these situations because "the subsequent verdict is necessarily based on a more complete presentation of the evidence than was the motion for summary judgment." *Davis v. International Harvester Co.*, 167 Ill. App. 3d 814, 819 (1988).

¶ 67    An exception exists where the issue raised in the summary judgment motion presents a question of law and, thus, would not be decided by the jury. *Young*, 2015 IL App (1st) 131887, ¶ 42. In such a case, the denial of a summary judgment motion does not merge with the judgment and may be addressed *de novo* on appeal. *Id.*

¶ 68    Here, the trial court specifically found that the summary judgment motion raised genuine issues of material fact, not questions of law, regarding Law Bulletin's publication of the Take Notice with the incorrect hearing date. Accordingly, it denied the motion, and the cause proceeded to trial. The order denying the summary judgment motion, based on the presence of genuine issues of material fact, merged with the judgment entered on the verdict and is not

appealable. *Id.*

¶ 69                                B. The Trial Court's Denial of Wheeler's Directed Verdict Motion

¶ 70    Next, Wheeler contends that the trial court erred in denying its motion for a directed verdict on its breach of contract claim. Verdicts should be directed only in those cases where all of the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *The Private Bank v. Silver Cross Hospital & Medical Centers*, 2017 IL App (1st) 161863, ¶ 40. "A directed verdict is improper where there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." (Internal quotation marks omitted.) *Id.* ¶ 41. The trial court's decision to deny a motion for directed verdict is reviewed *de novo*. *Young*, 2015 IL App (1st) 131887, ¶ 44.

¶ 71    To recover for breach of contract, a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) performance by the plaintiff, (3) breach of contract by the defendant, and (4) resultant injury to the plaintiff. *Burkhart v. Wolf Motors of Naperville, Inc.*, 2016 IL App (2d) 151053, ¶ 14.

¶ 72    Wheeler argues on appeal that the e-mail exchanges in April and May 2013 between Mr. Gray Jr. and Mr. Desnoyers, and between Mr. Phalen and Mr. Desnoyers, constituted a written contract for Law Bulletin to publish the Take Notices provided to it by Midwest on behalf of Wheeler. Wheeler contends that the trial evidence shows that Law Bulletin breached the contract by publishing the Take Notice for the Winchester property with the wrong hearing date. Therefore, Wheeler argues that the trial court erred by denying its motion for a directed verdict on its breach of contract claim.

¶ 73    Law Bulletin counters that there was sufficient evidence showing that Wheeler did not meet its contractual obligation under the 15-year course of dealing to review the published Take Notice and report the incorrect hearing date so that Law Bulletin could publish a corrected version within the notice-serving deadline. Thus, Law Bulletin argues, the trial court did not err in denying Wheeler's directed verdict motion.

¶ 74    In addressing the parties' respective arguments, we note that Wheeler pleaded the existence of an oral (not written) contract, or, in the alternative, an implied contract, as well as a 15-year business relationship and course of dealing between Wheeler and Law Bulletin.

> "The issues in any litigation are determined by the pleadings and an issue cannot be sustained by evidence absent a corresponding pleading. [Citation.] It is a fundamental rule, with no exceptions, that a party must recover, if at all, on and according to the case he has made for himself by his pleadings. He cannot make one case by his averments, and have judgment on another and different ground, even though the latter is established by the proof. [Citation.] [A] party cannot plead one cause of action in its complaint and receive judgment on the basis of a different cause of action." (Internal quotation marks omitted.) *In re Estate of Bontkowski*, 337 Ill. App. 3d 72, 77 (2003).

¶ 75    Having pleaded a cause of action for breach of an oral or implied contract between the parties that was supplemented by a 15-year course of dealing, Wheeler cannot now argue on appeal for recovery based on a different theory, *i.e.*, for breach of an express written contract that was not supplemented or qualified by a course of dealing. We proceed to address whether

the trial court erred in failing to direct a verdict for Wheeler on its claim for breach of an oral or implied contract that was supplemented by a prior 15-year course of dealing between the parties.

¶ 76                                    1. Course of Dealing Defined

¶ 77        We begin our analysis by addressing the meaning of "course of dealing." In other cases addressing course of dealing, we have cited section 223 of the Restatement (Second) of Contracts. See, *e.g.*, *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 620 (1988). The Restatement (Second) of Contracts states:

> "(1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
>
> (2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement." Restatement (Second) of Contracts § 223 (1981).

¶ 78        A prior course of dealing between the parties may be considered when determining the terms of an oral contract. *H&H Press, Inc. v. Axelrod*, 265 Ill. App. 3d 670, 677 (1994). "Further, where the terms of a contract are doubtful or uncertain and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the courts." *Wald*, 175 Ill. App. 3d at 620.

¶ 79                                    2. Course of Dealing Evidence

¶ 80        We consider the evidence at trial regarding the parties' course of dealing.

¶ 81        Timothy Gray, Wheeler's president, testified to the 15-year business relationship between Wheeler and Law Bulletin, whereby Wheeler (through its intermediary, Midwest) published between 1000 and 1600 Take Notices per year in the Chicago Daily Law Bulletin.

¶ 82        Mr. Desnoyers, the manager of Law Bulletin's Public Notice Network, also testified to the 15-year business relationship whereby Wheeler published its Take Notices in the Chicago Daily Law Bulletin. Until 2013, Frank Dufkis was the contact person at Midwest who e-mailed Mr. Desnoyers the Take Notices on behalf of Wheeler. Employees at Law Bulletin would copy and paste the Take Notices into the Law Bulletin software and publish them in the Chicago Daily Law Bulletin.

¶ 83        Mr. Desnoyers testified that at Mr. Dufkis's request, after the first publication of each batch of Take Notices, he would hand deliver a copy of the Chicago Daily Law Bulletin to the Midwest offices. Paralegals at Midwest, who were supervised by Mr. Dufkis, would review the first publication of the Take Notices in accordance with the dictates of the Handbook and make sure they were accurate. If any errors were discovered, Mr. Dufkis called or e-mailed Mr. Desnoyers. Law Bulletin would then republish the Take Notices at no cost to Wheeler within the notice-serving deadline. Several e-mails between Mr. Dufkis and Mr. Desnoyers from 2008 to 2011 were entered into evidence, corroborating the testimony of Mr. Desnoyers that Mr. Dufkis e-mailed or called him about any errors in the Take Notices and that Law Bulletin agreed to republish the corrected Take Notices at no cost to Wheeler.

¶ 84        Mr. Desnoyers followed this procedure with regard to the Take Notice for the Winchester property, even after Mr. Dufkis had left Midwest's employ and been replaced by Mr. Phalen.

Specifically, after Law Bulletin published the batch of Take Notices for the 2010 tax sale (which included the Take Notice for the Winchester property) on June 5, 2013, Mr. Desnoyers walked a copy of the Chicago Daily Law Bulletin over to the Midwest office on that same day, handed it to Mr. Gray Jr., and specifically told him to review the Take Notices for accuracy.

¶ 85    In an April 2014 e-mail to Mr. Ahearn (Mr. Desnoyer's successor), Mr. Gray Jr. acknowledged the longtime course of dealing with regard to Midwest/Wheeler's review of the published Take Notices, stating: "I, or my team, will proof read the actual paper when it is ran."

¶ 86                     3. Whether a Course of Dealing Has Been Proved Here

¶ 87    Viewed in the light most favorable to Law Bulletin (*The Private Bank*, 2017 IL App (1st) 161863, ¶ 40), the testimony of Mr. Gray, Mr. Desnoyers, Mr. Dufkis, and Mr. Ahearn, as well as the Handbook and the e-mail exchange between Mr. Ahearn and Mr. Gray Jr., shows a 15-year course of dealing that supplemented the contract and created additional contractual obligations for each party. *Id.*; *Carrico v. Delp*, 141 Ill. App. 3d 684, 688 (1986) (discussing how a previous course of dealing, as defined under section 223 of the Restatement (Second) of Contracts, may give meaning to or qualify an agreement). Specifically, pursuant to the course of dealing, Wheeler was contractually obligated to have Midwest check the first publication of each batch of Take Notices that was dropped off to Mr. Gray Jr., and report any errors to Mr. Desnoyers, who would republish the corrected Take Notices at no charge to Wheeler within the notice-serving deadline. Wheeler failed to meet its contractual obligation in this case, as it did not have Midwest review the June 5, 2013, Chicago Daily Law Bulletin, which contained the first publication of the Take Notice for the Winchester property, and inform Law Bulletin of the error in the hearing date. Wheeler's failure to meet its own contractual obligation defeats its claim for breach of contract against Law Bulletin. *Burkhart*, 2016 IL App (2d) 151053, ¶ 14.

¶ 88    Wheeler points to the testimony of Mr. Gray Jr., that the June 5 Chicago Daily Law Bulletin was not dropped off at his office for review. However, the testimony of Mr. Gray Jr. was contradicted by the testimony of Mr. Desnoyers. A directed verdict is improper where, as here, the evidence demonstrates a substantial factual dispute or where the credibility of the witnesses is decisive to the outcome. *The Private Bank*, 2017 IL App (1st) 161863, ¶ 41.

¶ 89    Wheeler also points to the testimony of Mr. Gray, Mr. Gray Jr., and Mr. Phalen that they were unaware (after the departure of Mr. Dufkis in 2013) of the contractual obligation established during the 15-year course of dealing whereby Wheeler would have Midwest review the first publication of each batch of Take Notices for accuracy and inform Law Bulletin of any errors. However, the testimony of Mr. Gray Jr., of his unawareness of the obligation of checking the published Take Notices for accuracy was arguably belied by the April 8, 2014, e-mail he sent to Mr. Ahearn, in which he stated, in response to Mr. Ahearn's e-mail regarding a new policy for cutting and pasting Take Notices, that "For now I assume you will do them as we have in the past and I, or my team, will proof read the actual paper when it is ran."

¶ 90    Wheeler argues that Mr. Gray Jr.'s April 8, 2014, e-mail was merely responding to an e-mail earlier that day from Mr. Ahearn that asked him to review the next Take Notices published in the Chicago Daily Law Bulletin for errors and did not constitute an acknowledgement of the course of dealing whereby Midwest/Wheeler had been reviewing the

published Take Notices for errors for the past 15 years. We note, though, a different possible construction of Mr. Gray Jr.'s e-mail, specifically, that his statement therein that he or his team would proofread Take Notices "as we have in the past" referenced his knowledge of the 15-year course of dealing. We reiterate that, in reviewing the order denying Wheeler's motion for a directed verdict, the evidence is viewed in the light most favorable to the opponent, Law Bulletin. *Id.* ¶ 40. As such, we construe Mr. Gray Jr.'s e-mail as referencing his knowledge of the 15-year course of dealing, which required Midwest/Wheeler to review the Take Notice for the Winchester property published in the June 5, 2013, Chicago Daily Law Bulletin, and inform Law Bulletin of the error in the hearing date.

¶ 91    In conclusion, we find that the evidence, viewed in the light most favorable to Law Bulletin, does not so overwhelmingly favor Wheeler that no contrary verdict could stand. Therefore, we affirm the denial of Wheeler's motion for a directed verdict.

¶ 92                    C. The Jury Instruction Defining Course of Dealing

¶ 93    Next, Wheeler contends that the trial court erred in giving the jury a non-IPI instruction, tendered by Law Bulletin, defining "course of dealing" and denying Wheeler's proposed instruction.

¶ 94    Generally, the trial court's decision to grant or deny an instruction is reviewed for an abuse of discretion, which considers whether, taken as a whole, the instructions fairly and correctly stated the law and were sufficiently clear so as not to mislead. *Eid v. Loyola University Medical Center*, 2017 IL App (1st) 143967, ¶ 56. However, when the question is whether the applicable law was accurately conveyed, the issue is a question of law reviewed *de novo*. *Id.*

¶ 95    Illinois Supreme Court Rule 239(a) (eff. Apr. 8, 2013) states:

"Whenever Illinois Pattern Jury Instructions (IPI), Civil, contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law. *** Whenever IPI does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given in that subject should be simple, brief, impartial, and free from argument."

¶ 96    The parties here point to no applicable IPI instruction defining "course of dealing." The non-IPI instruction given by the trial court stated:

"A previous course of dealing may give meaning to or qualify an agreement. Where the terms of a contract are doubtful or uncertain and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction may be considered by you."

¶ 97    The language in the non-IPI instruction, tendered by Law Bulletin and given to the jury, was taken directly from our opinion in *Wald*, 175 Ill. App. 3d at 620, and was a simple, brief, and accurate statement of Illinois law. Accordingly, the trial court did not err in giving the instruction.

¶ 98    We also find that the trial court properly rejected Wheeler's proposed non-IPI instruction, which stated:

"A prior course of dealing may not be used to contradict or modify a contract's express or written terms. A prior course of dealing applies only when the parties' conduct

- 12 -

establishes a common basis of understanding of the agreement between them. A party's unilateral understanding or belief of the agreement does not establish course of dealing. If the express or written terms of the contract and the offered course of dealing cannot be reconciled, then the express or written terms will control. A course of dealing, if applicable, may only be used to supplement or qualify existing terms."

¶ 99     The trial court found that the portion of Wheeler's proposed non-IPI instruction that stated that a course of dealing cannot be used to contradict written contractual terms was inapplicable because the contract at issue was not a written one. We find no error.

¶ 100    Wheeler argues, though, that the rest of its proposed non-IPI instruction should have been given, as it accurately stated that a course of dealing applies only where there is a common basis of understanding for interpreting the contract.

¶ 101    Wheeler's argument is that the non-IPI instruction given by the trial court misled the jury into thinking that Law Bulletin's unilateral understanding of the agreement was sufficient to establish a course of dealing imposing a requirement on Midwest/Wheeler to review all published Take Notices for errors, even where Midwest/Wheeler did not have that same understanding. We disagree.

¶ 102    Wheeler's argument would have merit if the instruction given by the trial court had stated that one party's unilateral understanding of the agreement was sufficient to establish a course of dealing. However, the instruction given by the trial court was stated in the plural, not the singular, as it informed the jury that a previous course of dealing is shown by the reasonable construction placed on the contract by the "parties" and by "their" conduct. By expressly stating that the prior course of dealing consists of the reasonable construction placed on the contract by the parties (plural), the court indicated to the jury that the course of dealing does not represent one party's unilateral understanding of the agreement, but rather is indicative of a common understanding of both Wheeler/Midwest *and* Law Bulletin. We find that the trial court committed no error in the giving of the jury instruction that, as discussed, accurately tracked the language in *Wald*.

¶ 103                    D. The Admission of Course of Dealing Evidence

¶ 104    Next, Wheeler argues that the trial court erred by admitting the course of dealing evidence as it was irrelevant, prejudicial, and likely to mislead the jury. The admission of evidence is a matter within the discretion of the trial court, and evidentiary rulings will not be reversed absent an abuse of discretion. *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 463 (1995).

¶ 105    " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 106    The course of dealing evidence was relevant to Law Bulletin's defense that the contract should not be considered in the abstract, but instead must be considered in the context of the parties' 15-year business relationship, whereby the first publication of the Take Notices was provided to Midwest to review on behalf of Wheeler, and Midwest/Wheeler was required to notify Law Bulletin of any errors so that they could be corrected within the notice-serving deadline. Law Bulletin contended that Wheeler failed to abide by the terms of the contract, as qualified by the course of dealing, when it failed to have Midwest review the published Take

Notice for the Winchester property and did not notify Law Bulletin of the incorrect hearing date in time for it to republish a corrected version.

¶ 107    As the course of dealing evidence was relevant to Law Bulletin's defense, the trial court did not abuse its discretion by admitting it at trial.

¶ 108    Wheeler next argues that Law Bulletin's course of dealing defense serves to exculpate it from any liability for publishing an inaccurate Take Notice, in effect creating an implied exculpatory clause. An exculpatory clause is a "contractual provision relieving a party from any liability resulting from a negligent or wrongful act." Black's Law Dictionary (7th ed. 1999). Wheeler cites case law, holding that an exculpatory clause must be clear and explicit (see *Garrison v. Combined Fitness Centre, Ltd.*, 201 Ill. App. 3d 581, 585 (1990)), and it extrapolates that an exculpatory clause must be put in writing and cannot arise only from course of dealing. Therefore, Wheeler contends that the trial court should not have admitted the course of dealing evidence.

¶ 109    Wheeler's argument is unavailing, as the parties' course of dealing did not create an implied exculpatory clause, relieving Law Bulletin from any liability for its negligence. Rather, the parties' course of dealing created mutual obligations on the parties, whereby Wheeler was obligated to have Midwest review the first publication of the Take Notices and to notify Law Bulletin of any errors; in turn, Law Bulletin was to republish the corrected Take Notices at no charge to Wheeler within the notice-serving deadline. The jury ruled in favor of Law Bulletin on Wheeler's breach of contract claim, not because there was an implied exculpatory clause relieving Law Bulletin of any and all liability for publishing inaccurate Take Notices, but because Wheeler failed to perform its obligation to have Midwest review the first publication of the Take Notice for the Winchester property and inform Law Bulletin of the incorrect hearing date.

¶ 110    E. The Trial Court's Denial of Wheeler's Motions *In Limine*

¶ 111    Wheeler next argues that the trial court erred by denying various *in limine* motions. The trial court's ruling on a motion *in limine*, addressing the admission of evidence, will not be disturbed on review absent an abuse of discretion. *In re Estate of Andre T.*, 2018 IL App (1st) 172613, ¶ 34.

¶ 112    First, Wheeler argues that the trial court erred by denying its *in limine* motion to bar admission of the course of dealing evidence. Wheeler is essentially rearguing that the course of dealing evidence was not relevant. For all the reasons discussed earlier in this opinion, we find that the trial court committed no abuse of discretion in denying the *in limine* motion and admitting the course of dealing evidence.

¶ 113    Next, Wheeler argues that the trial court erred by denying its *in limine* motion to bar admission of the Handbook. We disagree. The Handbook was promulgated by Mr. Gray Sr. in 2002, and it memorialized the parties' course of dealing whereby Midwest assumed the obligation, on behalf of Wheeler, to review the first publication of the Take Notices for accuracy and inform Law Bulletin of any errors. Thus, the Handbook was relevant and admissible to support Law Bulletin's course of dealing defense.

¶ 114    Next, Wheeler argues that the trial court erred by denying its *in limine* motion to bar evidence of the disclaimer in the Chicago Daily Law Bulletin's masthead, which states that "Publisher is not responsible for errors in advertisements after first publication if not advised

by the advertiser." Wheeler contends that "Law Bulletin promised to publish the content it received from Wheeler accurately, without altering it. Because the masthead disclaimer purports to exculpate Law Bulletin from liability for altering the Wheeler Take Notice and publishing the defective content, it is unenforceable as a matter of law." In support, Wheeler cites *Jewelers Mutual Insurance Co. v. Firstar Bank Illinois*, 213 Ill. 2d 58, 65 (2004), which held that a party cannot contract to act in a certain manner and then exculpate itself from liability for breach of that very promise because otherwise the party's contractual duties would be illusory.

¶ 115 Wheeler's claim of error is without merit. The masthead disclaimer was consistent with the parties' contract (supplemented by the 15-year course of dealing) and did not render Law Bulletin's contractual duties illusory; Law Bulletin remained obligated under the contract to publish the Take Notices and to republish them when notified of any errors. Accordingly, we find no abuse of discretion in the admission of the masthead disclaimer.

¶ 116 Next, Wheeler argues that the trial court erred by admitting evidence that it was not damaged by Law Bulletin's alleged contractual error because there was failure of service in the underlying tax deed proceeding that would have prevented Wheeler from obtaining a deed to the Winchester property even if Law Bulletin had accurately published the Take Notice.

¶ 117 Wheeler contends that such evidence was "irrelevant, collateral, and created a trial-within-a-trial." Error, if any, was harmless where the jury's verdict was not premised on the absence of damages due to the failure of service in the underlying tax proceeding; rather, in its answers to the questions posed in the verdict form, the jury made clear that it was finding in favor of Law Bulletin, based on Wheeler's failure to perform its obligation under the contract, as supplemented by the 15-year course of dealing, to have Midwest review the published Take Notice for the Winchester property and then timely notify Law Bulletin of the error in the hearing date.

¶ 118 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 119 Affirmed.